1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10                          **FRESNO DIVISION**

11

12  **DORIAN DAVIS aka WALI AL-TAQUI,**          Civil No.     1:08cv01197-JTM(JMA)
    **CDC #k-78041,**
13
                                    **Plaintiff,**   **ORDER DENYING PLAINTIFF'S**
14                                                   **MOTIONS FOR SUMMARY**
                                                     **JUDGMENT AND TO STRIKE**
15              **vs.**                              **DECLARATION**

16  **E.G. FLORES, *et al.*,**

17                                  **Defendants.**   **[Dkt Nos. 38, 43]**

18

19        Plaintiff Dorian Davis ("Davis"), a state prisoner incarcerated at Kern Valley State Prison in

20  Delano, California, is proceeding *pro se* and *in forma pauperis* with a First Amended Complaint

21  ("FAC") filed September 25, 2009 in this 42 U.S.C. § 1983 civil rights action alleging, among other

22  things, violations of his religious rights under the First Amendment and a federal statute.  (Dkt No. 32.)

23  By Order entered November 23, 2009, the Court *sua sponte* dismissed defendant R. Marta  from this

24  action as not renamed in the FAC, but ordered the four other named defendants (collectively

25  "Defendants") to file a response to the FAC.[1]   (Dkt No. 33.)   Defendants filed an Answer on

26  January 4, 2010.  (Dkt No. 34.)

27  ─────────────────

28      [1]  This case was re-assigned for all purposes  from the bench of the Eastern District of California to this
    Court on November 26, 2008.  (Doc. No. 8.)

1    Davis has filed a Motion For Summary Judgment ("Motion") pursuant to Fᴇᴅ. R. Cɪᴠ. P.

2    ("Rule") 56  "on liability to the Plaintiff on his Religious practices and Services claims."  (Dkt No. 38,

3    36:22-24.)   The Motion encompasses by reference to those claims his First Amendment religious

4    practices cause of action (conduct of Muslim services and purchase and possession of prayer oils issues),

5    his federal statutory violation claim under the Religious Land Use And Institutionalized Persons Act,

6    42 U.S.C. § 2000cc (the "RLUIPA"), his equal protection claim, and his retaliation claim.   The Court

7    set a briefing schedule for Defendants' Opposition to Davis' Motion and for Davis' Reply, as well as an

8    optional briefing schedule should Defendants elect to file a cross-motion for summary judgment, along

9    with the required Klingele / Rand notice informing Davis of the consequences should Defendants file

10   and prevail on a summary judgment motion.  (Dkt No. 40.)  On April 12, 2010, Defendants timely filed

11   only an Opposition to the Motion and a Response to Davis' Statement Of Undisputed Facts.  (Dkt Nos.

12   41, 42.)  Davis filed a Reply to the Opposition, a Motion To Strike the Declaration of defendant A.

13   Hedgpeth in support of Defendants' Opposition, and a Reply to Defendants' Response to Plaintiff's

14   Statement Of Undisputed Facts.  (Dkt Nos. 43-45.)  For the reasons discussed below, Davis' Motion is

15   **DENIED**, and his causes of action alleging equal protection violations, retaliation, and cruel and unusual

16   punishment are **DISMISSED** as a matter of law for failure to state a claim.

17   **I.      BACKGROUND**

18    Davis filed his civil rights Complaint initiating this action on August 15, 2008.  Defendants

19   moved to dismiss the Complaint, elaborating multiple deficiencies in the statement of his claims.  (Dkt

20   No. 23.)  Simultaneously with his Opposition to that motion, Davis sought leave to amend his complaint

21   (Dkt No. 27.)  The Court granted him leave to amend, mooting Defendants' motion to dismiss.  (Dkt No.

22   28.)  The FAC was filed September 25, 2009 (Dkt No. 32).  Davis thus had the benefit of Defendants'

23   briefing on deficiencies in the original pleading when preparing his FAC.

24    Davis contends he has been a Muslim of the Al-Islam faith since 1996.  He arrived at Kern

25   Valley State Prison ("KVSP") in October 2005.  He alleges that for a period of months in 2007 and 2008,

26   he and other Muslim prisoners were denied  the right to purchase and possess prayer oil for a religious

27   practice prescribed by his faith, pursuant to a supplemental department policy Warden Hedgpeth added

28   to the Department Operations Manual ("DOM").   He also alleges Islamic religious services were

1   suspended after the prison dismissed from his chaplaincy a certain Imam who had been conducting

2   religious services for the KVSP's Muslim community, and Defendants prohibited the Muslim prisoners

3   from conducting unsupervised religious services themselves thereafter, pursuant to the same policy. (Id.

4   pp. 6-8, 10-12.). Davis alleges violations of his First Amendment rights to practice his religion, the

5   RLUIPA, equal protection, and the Eighth Amendment associated with the restrictions imposed by

6   implementation of the supplemental policy, and retaliation against Muslim prisoners after the dismissed

7   Imam initiated litigation against KVSP. (FAC, Dkt No. 32, pp. 6., 12-14)

8          Defendants succinctly summarize the contextual background for Davis' religious practices and

9   services denial claims forming the subject matter of his MSJ, consistently with facts Davis himself either

10  alleges or does not dispute.

11                 On December 7, 2007, Kern Valley State Prison (KVSP)
                   instituted Department Operations Manual (DOM) Supplement 101060.
12                 (Plaintiff's Motion for Summary Judgment "MSJ" 4:22-25; see also
                   Exhibit A to Declaration of Dorian Davis "Davis Decl."). Supplement
13                 101060 stated, in part, that prayer oils were only to be used during
                   religious services in the chapel and that inmates were not allowed to
14                 purchase or possess prayer oils in their cells. (MSJ 4:22-25; see also
                   Davis Decl., Ex. A ). Plaintiff, an inmate incarcerated at KVSP, and a
15                 practicing Muslim, claims that DOM Supplement 101060 caused undue
                   hardship to the practice of his religion since the tenets of his religion
16                 require him to "put on oil" before prayer. (MSJ 6: 20-24, 11:9-15).

17                 In October or November 2007, KVSP's Muslim Chaplain, Bilal
                   Mustafa, was fired from KVSP. (MSJ 4:9-11). Chaplain Mustafa's
18                 position was unfilled until the Spring of 2009. (MSJ 4:11-12.) Without
                   a Muslim Chaplain, Plaintiff claims that Friday Muslim services were
19                 suspended. (MSJ 4:12-13).

20  (Opp. Dkt No. 41 2:4-15.)

21         Davis names as defendants E.G. Flores, an acting associate warden, J. Castro, an acting associate

22  warden, T. Billings, a correctional counselor, and A. Hedgpeth, warden. (FAC, Dkt No. 32, p. 5.) He

23  sues them "in their official and individual capacity." (Id., p. 15.) In particular, the FAC seeks a

24  declaratory judgment that defendants Flores and Castro retaliated and discriminated against him in

25  violation of his First Amendment "right to freely practice and establish his religion," that defendants

26  Flores, Billings, and Castro denied him "the right to purchase and possess religious prayer oil without

27  a penological interest conducive to a safety and security concern" in violation of his First Amendment

28  rights, that defendant Hedgpeth failed to intervene and stop or reverse the actions of the other

1    Defendants in violation of the First Amendment right to free religious practice and of the RLUIPA, and

2    an "Eighth Amendment violation for [Hedgpeth's] deliberate indifference" in his capacity as Warden

3    responsible for religious services.  (FAC, Dkt No. 32, pp. 16-17.)  Davis further seeks injunctive relief,

4    among other things, to require defendants Flores and Castro "to allow an inmate minister to conduct

5    Jumu'ah services per C.C.R. §§ 3211(A)," to "cease the custom and illegal action of discrimination of

6    the adherents of Islam and deprivations," to order amendment of the DOM to permit prisoners to be in

7    the chapel without chaplain supervision, and to order defendants Flores, Castro, and Billings "to release

8    the oils and other artifacts of Plaintiff and other Muslims similar[ly] situated."  (Id. p. 17.)  Davis also

9    seeks monetary damages to compensate "for the pain and suffering for their denial of religious practices"

10   and for the "deprivations of Plaintiff['s] worship oil that prevented his religious practices" as well as

11   punitive damages from each defendant.  (Id. pp. 17-19.)

12        Defendants deny the allegations and assert affirmative defenses, including, among others:  failure

13   to exhaust administrative remedies; qualified immunity and immunity from liability; failure to state a

14   claim upon which relief can be granted; Eleventh Amendment bar to suit; and statute of limitations.

15   (Ans., Dkt No. 34, p. 3.)  None of the immunity or exhaustion or limitations period affirmative defenses

16   is advanced in the Defendants' Opposition to the Motion.  (Dkt No. 42.)

17        Davis supports his Motion For Summary Judgment with his Declaration (Dkt No. 38, pp. 2-11),

18   points and authorities (Id. pp. 13-36), a Statement Of Undisputed Facts (Id., pp. 46-53), and multiple

19   Exhibits.  Davis signed both his Declaration and his Statement Of Undisputed Facts under penalty of

20   perjury (Dkt No. 38, pp. 2-11, 46-53), permitting the Court to consider both for evidentiary purposes on

21   summary judgment.  See Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) ("[l]ike a

22   verified complaint, a verified motion functions as an affidavit," so that facts set forth therein "are

23   evidence to be considered when deciding a motion for summary judgment").

24        Defendants support their Opposition with points and authorities (Dkt No. 41-1), the Declaration

25   of defendant Hedgpeth (Dkt No. 41-2), and a Response to Davis' Statement Of Undisputed Facts (Dkt

26   No. 42.).  They represent Davis cannot tie any of the defendants to an actual violation of his civil rights.

27   (Dkt No. 41, 9:2-6.)  They oppose the Motion on grounds:  Davis "has not met his burden in establishing

28   a valid RLUIPA claim against Defendants" (Dkt No. 41, 2:20-21); failure "to establish that DOM

1  Supplement 101016 substantially burdened the practice of [Davis'] religious beliefs" (Id. 3:4-5); the

2  conduct giving rise to the Complaint "was done in furtherance of a compelling governmental interest

3  and [was] the least restrictive means of furthering that compelling governmental interest" (Id. 4:1-3);

4  failure "to establish a causal connection between any conduct by Defendants Billings, Castro and Flores

5  to a violation of [Davis'] civil rights" (Id. 5:1-2, 9:1-2,  representing that those defendants "were simply

6  part of the inmate grievance process" associated with review of a group appeal Davis had joined; Davis'

7  "First Amendment retaliation claim must fail since it is not predicated on plaintiff's exercise of protected

8  conduct" (Id. 6:3-5); he "has set forth no evidence or argument in support of a viable due process claim"

9  (Id. 6:23-24); and his Equal Protection claim cannot stand "since it is not based on conduct affecting

10  similarly situated individuals" (Id. 7:7-9).

11      Davis' Reply (Dkt No. 44) primarily reiterates the merits of his claims.  He also responds to

12  Defendants' Response to his initial Statement Of Undisputed Facts in a manner replete with argument

13  (Dkt No. 45), the contents of which, like that of Defendants' Response, demonstrates that multiple facts

14  are in dispute, be they material or immaterial to Davis' claims.  Finally, as part of his Reply, Davis

15  moves to strike the Hedgpeth Declaration as defective for evidentiary purposes.  (Dkt No. 43.)

16  **II.    DISCUSSION**

17      **A.    <u>Legal Standards</u>**

18          **1.    Civil Rights Act, 42 U.S.C. § 1983**

19      The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), creates a procedure for the vindication

20  of constitutional rights violations.

> [Section 1983] creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution.  Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials.   To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred "under color of state law" and (2) the action resulted in the deprivation of a constitutional right or federal statutory right. [Citations.]

<u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002), *citing* <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981),

*overruled on other grounds by* <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); *see also* <u>Graham v. Connor</u>,

\\

1   490 U.S. 386, 393-94 (1989) ("[Section] 1983 'is not itself a source of substantive rights,' but merely

2   provides 'a method for vindicating federal rights elsewhere conferred' ") (citation omitted).

3        Thus, to prevail on  a cause of action under Section 1983, a plaintiff must "plead and prove (1)

4   the defendants acted under color of state law and (2) deprived plaintiff of rights secured by the

5   Constitution or federal statutes." WMX Techs., Inc. v. Miller, 197 F.3d 367, 372 (9th Cir. 1999) (*en*

6   *banc*) (citation omitted); *see also* Levine v. City of Alameda, 525 F.3d 903, 905 (9th Cir. 2008) (to state

7   a *prima facie* case for relief under Section1983, a plaintiff must allege that "an individual acting under

8   the color of state law deprived him of a right, privilege, or immunity protected by the United States

9   Constitution or federal law"); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978) ("A person 'subjects'

10  another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an

11  affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally

12  required to do that causes the deprivation of which complaint is made").

13       Absent factual allegations of direct participation by the named state actor, no cognizable

14  constitutional claim is stated against that person.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

15  There is no *respondeat superior* liability under Section 1983.  Monell v. Dept. of Soc. Servs, 436 U.S.

16  658 (1978) (the supervisor of someone who allegedly violated a plaintiff's constitutional rights is not

17  made liable for the violation by virtue of that role).  Rather, a supervisor is liable in his or her individual

18  capacity for constitutional violations of a subordinate only "if the supervisor participated in or directed

19  the violations, or knew of the violations and failed to act to prevent them."  Taylor, 880 F.2d at 1045.

20       Federal courts must "liberally construe the inartful pleading of pro se litigants." Eldridge v.

21  Block, 832 F.2d 1132, 1137 (9th Cir. 1987) (citations omitted).  A pro se litigant's allegations in a

22  complaint "are held to less stringent standards than formal pleadings drafted by lawyers." Id.; *see*

23  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (a plaintiff need only give the defendant fair notice of the

24  claim and the grounds on which it rests).  That rule, however, "applies only to a plaintiff's factual

25  allegations." Neitzke v. Williams, 490 U.S. 319, 330 n.9 (1989). " '[A] liberal interpretation of a civil

26  rights complaint may not supply essential elements of the claim that were not initially pled.' " Bruns v.

27  Nat'l Credit Union Admin., 122 F.3d 1251, 1257 ( 9th Cir. 1997), *quoting* Ivey v. Bd. of Regents, 673

28  F.2d 266, 268 (9th Cir. 1982); *see also* Pena v. Gardner, 976 F.2d 469, 471 (9th Cir. 1992) (*per curiam*).

1

## 2.  Prison Litigation Reform Act

2          The Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e, changed the processing

3   of prisoner pro se complaints in several ways.  With respect to the dismissal of defective claims, the

4   court may at any time dismiss an action or portions of it *sua sponte* or on a party's motion:

5              (c) Dismissal

6              (1) The court shall on its own motion or on the motion of a party dismiss
               any action brought with respect to prison conditions under section 1983
7              of this title, or any other Federal law, by a prisoner confined in any jail,
               prison, or other correctional facility if the court is satisfied that the action
8              is frivolous, malicious, fails to state a claim upon which relief can be
               granted, or seeks monetary relief from a defendant who is immune from
9              such relief.

10             (2) In the event that a claim is, on its face, frivolous, malicious, fails to
               state a claim upon which relief can be granted, or seeks monetary relief
11             from a defendant who is immune from such relief, the court may dismiss
               the underlying claim without first requiring the exhaustion of
12             administrative remedies.

13  42 U.S.C. § 1997e(c).[2]

14         The PLRA also restricts the availability and extent of remedies prisoners may seek in civil rights

15  actions.  For example,  recovery for mental or emotional injury suffered while in custody requires "a

16  prior showing of physical injury" that is more than *de minimus*.  42 U.S.C. § 1997e(e); *see* <u>Oliver v.</u>

17  <u>Keller</u>, 289 F.3d 623, 627 (9th Cir. 2002); *see* <u>Jackson v. Carey</u>, 353 F.3d 750, 758 (9th Cir. 2003).

18  However, no such showing applies to allegations of constitutional violations not premised on mental or

19  emotional injury.  *See* <u>Canell v. Lightner</u>, 143 F.3d 1210, 1213 (9th Cir. 1998) (First Amendment

20  establishment and free exercise of religion claims).  The PLRA also affects the type of prospective

21  injunctive relief that may be awarded, but retained substantially unchanged "the threshold findings and

22  standards required to justify an injunction."  <u>Gomez v. Vernon</u>, 255 F.3d 1118, 1129 (9th Cir. 2001);

23  *see also* 18 U.S.C. § 3626(a)(1)(A) (1997).

24  \\

25  ───────────────

26         [2] Similarly, the screening and grounds for dismissal provisions in the *in forma pauperis* statute provide,
    in pertinent part:  "(b) Grounds for dismissal.--On review, the court shall identify cognizable claims or dismiss
27  the complaint, or any portion of the complaint, if the complaint-- (1) is frivolous, malicious, or fails to state a
    claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such
28  relief."  28 U.S.C. § 1915(A).

### 3.   Summary Judgment Standard Of Review

Any party "may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Rule 56(a), (b).  Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. ("Rule") 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 256 (1986).  The movant bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  The movant is not required to produce evidence negating the non-movant's claims.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990) ("the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues").  If the movant carries its burden, the burden then shifts to the non-moving party to establish facts beyond the pleadings showing there remains a triable issue of disputed material fact so that summary judgment is not appropriate.  Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157; *see also* Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

To successfully rebut a properly supported summary judgment motion, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the [nonmoving party's] favor, could convince a reasonable jury to find for [that party]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000); *see also* Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007).  The non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324, *quoting* FED. R. CIV. P. 56(e)).  The opposing party may not rest on conclusory allegations or mere assertions.  *See* Taylor, 880 F.2d at 1045.  Rather, it must present significant probative evidence of specific facts raising a material issue that "can be resolved only by a finder of fact because [the issue] may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 249-50, 256.

1   "A material issue of fact is one that affects the outcome of the litigation and requires a trial to

2   resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th

3   Cir. 1982).   The materiality of facts is determined by looking to the substantive law defining the

4   elements of the claim.  *See* Anderson, 477 U.S. at 248; *see also* Hernandez v. Johnston, 833 F.2d 1316,

5   1318 (9th Cir. 1987).   The moving party has the burden "to show initially the absence of a genuine issue

6   concerning a material fact." Adickes, 398 U.S. at 159.  If the moving party fails to discharge this initial

7   burden, summary judgment must be denied, and the court need not consider the non-moving party's

8   evidence. Id.. at 159-60. When the Court considers evidence from both sides, "[i]f reasonable minds

9   could differ" and  there is "evidence on which the jury could reasonably find for the [non-moving]

10  party," summary judgment for the moving party is improper. Anderson, 477 U.S. at 252.  Conversely,

11  summary judgment must be entered in favor of the moving party "if, under the governing law, there can

12  be but one reasonable conclusion as to the verdict." Id. at 250-251; Celotex, 477 U.S. at 325.

13      In deciding a summary judgment motion, the court does not make credibility determinations,

14  weigh conflicting evidence, or draw inferences, as those are functions reserved for the trier of fact.

15  Anderson, 477 U.S. at 249, 255, 249 (district court's role on summary judgment is merely to determine

16  whether there is a genuine issue for trial).  Rather, the court considers the evidence in the light most

17  favorable to the non-moving party and accepts the version of disputed facts most favorable to that party.

18  Anderson, 477 U.S. at 255; *see* Lujan, 497 U.S. at 888 ("In ruling upon a Rule 56 motion, 'a District

19  Court must resolve any factual issues of controversy in favor of the non-moving party' only in the sense

20  that, where the facts specifically averred by that party contradict facts specifically averred by the movant,

21  the motion must be denied") (citations omitted).

22      **B.      Hedgpeth Declaration Satisfies Rule 56(e) Evidentiary Requirements**

23      Davis moves to strike the Hedgpeth Declaration in support of Defendants' Opposition to his

24  Motion on grounds it is "defective" for failure to state that its contents are based on   "personal

25  knowledge" and failure to identify "the county and state in which the statements are made." (Dkt No.

26  43, pp. 1-2.) Courts deciding summary judgment motions look to the content of the evidence submitted,

27  rather than the admissibility of its form, to determine whether it complies with the requirements of Rule

28

1   56(e).[3]  *See* <u>Fonseca v. Sysco Food Service of Arizona</u>, 374 F.3d 840, 846 (9th Cir. 2004) (to survive

2   summary judgment, a party does not have to produce evidence in a form that would be admissible at

3   trial, as long as the party satisfies the requirements of Rule 56); *see also* <u>Fraser v. Goodale</u>, 342 F.3d

4   1032, 1037 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of

5   the evidence's form" but rather "on the admissibility of its contents").  For example, "hearsay evidence

6   produced in an affidavit may be considered on summary judgment if the declarant could later present

7   the evidence through direct testimony." <u>Id.</u> (citation omitted).  The "personal knowledge requirement

8   in Rule 56(e) can be met by inference." <u>Fonseca</u>, 374 F.3d at 846 (citation omitted).

9          Hedgpeth signed his Declaration under penalty of perjury.  The material facts stated therein are

10   on their face within his personal knowledge, such as the range of dates he served as the Warden at Kern

11   Valley State Prison, his claim of personal responsibility for adding Supplement 101060 to the DOM on

12   December 7, 2007 prohibiting inmates from purchasing and possessing the oils in their cells, his

13   authority and reasons for doing so in response to safety and security concerns at the prison he identified

14   as associated with contraband smuggled in and distributed to inmates by the dismissed Imam, and the

15   circumstances leading to an addendum to the DOM Supplement 101060 about seven months later, which

16   relaxed the restrictions on inmate possession of prayer oil in their cells after he determined the issues

17   that led to the restrictions had been addressed.  (Dkt No. 41-2, ¶¶ 1-8.)  Accordingly, Davis' Motion to

18   Strike the Hedgpeth Declaration is **<u>DENIED</u>** because his technical objections do not support a finding

19   the contents of the Declaration may not be considered on summary judgment.

20          **C.      <u>Triable Issues Of Material Fact Preclude Summary Judgment For Plaintiff</u>**

21          **1.      <u>First Amendment Free Exercise Cause Of Action</u>**

22          "The First Amendment, applicable to the States by reason of the Fourteenth Amendment . . .

23   prohibits government from making a law 'prohibiting the free exercise (of religion).' " <u>Cruz v. Beto</u>, 405

24   U.S. 319 (1972) (*per curiam*) (citation omitted).  "[C]onvicted prisoners do not forfeit all constitutional

25   protections by reason of their conviction and confinement in prison." <u>Bell v. Wolfish</u>, 441 U.S. 520, 545

26   (1979).  "The right to exercise religious practices and beliefs does not terminate at the prison door."

27   _____

28   [3]  "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. . . . ." Rule 56(e).

1  McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (*per curiam*); *see also* O'Lone v. Estate of

2  Shabazz, 482 U.S. 342, 348 (1987).  However, "[t]he free exercise right . . . is necessarily limited by the

3  fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain

4  prison security."  McElyea, 833 F.2d at 197 (citations omitted); *see also* O'Lone, 482 U.S. at 348;

5  Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008).  "[A] prison inmate retains those First

6  Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate

7  penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 832 (1974) ("the

8  institutional consideration of internal security within the correctional facilities" is "central to all other

9  corrections goals"); *see also* Ashker v. Cal. Dep't of Corr., 350 F.3d 917, 922 (9th Cir. 2003)

10  (regulations must have a logical connection to the asserted goal to avoid arbitrary or irrational

11  deprivation of rights).

12      A prison regulation that impinges on First Amendment rights "is valid if it is reasonably related

13  to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); *see also* Beard v. Banks,

14  548 U.S. 521, 528 (2006) (access to newspapers, magazines, and photographs); Overton v. Bazzetta, 539

15  U.S. 126, 132 (2003) (freedom of association); Lewis v. Casey, 518 U.S. 343, 361 (1996) (access to

16  courts); Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005) (access to non-subscription

17  bulk mail); Morrison v. Hall, 261 F.3d 896, 901 (9th Cir. 2001) (prison mail regulation); Mauro v.

18  Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (*en banc*) (sexually explicit material).  Courts analyze these

19  competing interests by applying a "reasonableness" test to First Amendment challenges and accord

20  prison officials great deference when analyzing the constitutional validity of prison regulations.[4]  *See*

21  Beard, 548 U.S. at 528-30; Overton, 539 U.S. 126, 132 (2003); Turner, 482 U.S. at 84-85; Prison Legal

22  News v. Cook, 238 F.3d 1145, 1149 (9th Cir. 2001).

23      In order to prevail on his First Amendment Free Exercise violation claim, Davis must prove that

24  the suspension of possession of prayer oil in his cell infringed a sincerely held religious tenet without

25  penological justification. *See* Shakur, 514 F.3d at 884-85.  The relevant factors in determining whether

26  _____

27      [4] The Turner Court explicitly rejected the application of "strict scrutiny" to a prisoner's First Amendment
    claims.  "Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would
    seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable

28  problems of prison administration." Turner, 482 U.S. at 89.

1    a regulation, or its application in a particular situation, is reasonable are:  (1) whether there is a valid,

2    rational connection between the regulation and a legitimate and neutral government interest, (2) whether

3    there are alternative means of exercising the constitutional right, (3) the impact the accommodation of

4    the right will have on prison staff and other prisoners, and (4) whether the regulation is an exaggerated

5    response to prison concerns, in light of readily available alternatives.  *See* Turner, 482 U.S. at  89-91.

6    In evaluating a Free Exercise claim, a court must give "appropriate deference to prison officials,"

7    O'Lone, 482 U.S. at 349, because "the judiciary is 'ill-equipped' to deal with the difficult and delicate

8    problems of prison management." Thornburgh v. Abbot, 490 U.S. 401, 407-08 (1989) (citation omitted).

9         Under the first Turner factor, the court examines whether there is a valid, rational connection

10   between the restrictive regulation and the legitimate interest used to justify the regulation.  *See* Ashker,

11   350 F.3d at 922; Morrison, 261 F.3d at 901; Cook, 238 F.3d at 1151.  Legitimate penological interests

12   include security, the preservation of order and discipline, the maintenance of institutional security

13   against escape or unauthorized entry, and the rehabilitation of the prisoners.  *See* Thornburg, 490 U.S.

14   401 (regulation concerning entry of materials into a prison to forestall risk of disorder); *see also* Mauro,

15   188 F.3d at 1059 (protecting guards).  With respect to the connection between the regulation of religious

16   exercise and penological interests, evidence concerning anticipated problems, even though no actual

17   problems have arisen from the prisoner's conduct, is sufficient to meet this standard.  *See* Standing Deer

18   v. Carlson, 831 F.2d 1525, 1528 (9th Cir. 1987).  The Ninth Circuit has upheld policies prohibiting

19   inmate-led religious services for security reasons.  *See* Anderson v. Angelone, 123 F.3d 1197, 1198-99

20   (9th Cir. 1997).  Moreover,  prison officials have no affirmative obligation to provide particular clergy

21   of choice for inmates. *See* Ward v. Walsh, 1 F.3d 873, 880 (9th Cir. 1993); Reimers v. Oregon, 863 F.2d

22   630, 631-32 (9th Cir. 1989); Allen v. Toombs, 827 F.2d 563, 566-69 (9th Cir. 1987)..

23        Davis provides a copy of the DOM Supplemental Policy 101060 as an exhibit to his FAC. (Dkt

24   No. 38, pp. 56-74.)  Pertinent portions of the policy provide:

25        101060.6 WORSHIP SERVICES

26        . . . 1010.6.3  USE OF INMATE MINISTERS  No inmate will be
           authorized or allowed to conduct or lead any religious services, classes,
27         or groups of any kind in the facility chapels, without being under the
           direct supervision of a facility chaplain or authorized volunteer.

28        . . .

101060.10  SACRAMENTAL WINE AND RELIGIOUS ARTIFACTS

> . . . **Prayer Oils** must be non-flammable and non-alcoholic in factory plastic see-through sealed containers accompanied by a Material Safety Data Sheet (MSDS) indicating contents in oil.  Only four fragrances (Egyptian Musk, Medina Musk, Blue Nile, and Somali Rose)[] prayer oils may be donated to the institution. Prayer oils will only be used during religious services in the chapel. Inmates will not be able to purchase or possess this item.

((Dkt No. 38, pp. 56, 60, 69, 74.)

Defendant Warden Hedgpeth declares he implemented DOM Supplement 101060 motivated by safety and security concerns.  In particular, with respect to the prayer oil restriction, he avers contraband had entered the prison through prayer oil containers distributed to prisoners by the dismissed Imam.

> 5.      DOM Supplement 101060 was created in response to serious safety and security concerns that had arisen at KVSP.  Prior to establishing DOM Supplement 101060, KVSP officials determined that a religious Chaplain was smuggling contraband into the prison and distributing the contraband to the inmates.  One way the contraband was distributed was through the distribution of containers of prayer oils. KVSP is a security level four prison.  Level four prisons house the most dangerous and violent inmates incarcerated within CDCR.  The possibility of unknown contraband hidden by level four inmates under the guise of being prayer oil caused me grave concern.
>
> 6.      Therefore, I was forced to create DOM Supplement 101060 in order to remove all potential contraband from the prison and ensure that inmates were not in possession of contraband.  Under DOM Supplement 101060, inmates were still allowed to use prayer oils in the prison chapel, which was open to inmate use during the day and during religious services.  After carefully reviewing the situation, I determined that this would be the least restrictive means of ensuring the safety and security of the institution.

(Dkt No. 41-2, Hedgpeth Decl. ¶¶ 5-6.)

Defendants do not dispute Davis' contentions enforcement of those regulations caused Davis to be deprived of possession of prayer oil in his cell, a prohibition that lasted from December 2007 through July 2008, and of religious services for an even longer period after Imam Bilial's chaplaincy was terminated because he and other inmates were not permitted to hold religious services unsupervised. (Dkt No. 42, 4:18-24.)  The fact that inmates were permitted before that period of time and thereafter to purchase and possess prayer oils is also not disputed.  (Dkt No. 42, 5:8-14; 7:22-24.)  Davis acknowledges: "Recently, the Islamic practice of putting on oil for salat (prayer) and other rituals ha[s] been restored to the Muslim[s] . . . by the permission from these same defendants to purchase and

1   possess oil," beginning in July 2008, but he characterizes that change as "an implication that it was a

2   blatant violation of the right of Plaintiff to practice his religion." (FAC, Dkt No. 32, p. 14.) He

3   summarily alleges "this act of returning the right to freely practice one's religious acts such as putting

4   on oil to perform salat  and other rituals is to try to clean up or right the wrong because there was never

5   a security or safety reason cited for the denial to purchase and possess religious prayer oil." (Id. p. 15.)

6   He thus urges an inference from restoration of those privileges a finding of fact that Defendants acted

7   maliciously and capriciously in denying them, summarily arguing the prohibitions imposed an

8   unwarranted restriction on his religions practices without any penological justification. (Id.) Defendants

9   dispute not only Davis' contention that the restrictions were without penological justification, but also

10  the import of that restriction, because "nothing prohibited Plaintiff from using prayer oils in the facility

11  chapel" during the day and during religious services throughout the period the policy restriction was in

12  force.  (Dkt No. 42, 3:9; see also Dkt No. 41-2, Hedgpeth Decl. ¶¶ 4, 6.)

13          Without making any factual findings on the merits of Davis' claims, the Court credits the

14  evidence properly before the Court in opposition to the motion raising triable issues of material fact.

15  Warden Hedgpeth declares Imam Mustafa was removed from his chaplaincy when it was discovered he

16  facilitated the introduction of contraband into the prison in prayer oil containers, and  he consequently

17  suspended inmates' privilege to have prayer oils in their cells in order to conduct an investigation into

18  the threat and to seize any contraband.  In addition, with respect to Davis' challenge to the denial of

19  prisoners' unsupervised religious services following the Imam's removal as an interference with religious

20  exercise without a legitimate penological interest, Warden Hedgpeth declares KVSP is a level four

21  prison housing the most serious and violent prisoners.  The Court notes, without pre-judging the merits

22  of Davis' claim, the Ninth Circuit has upheld policies prohibiting inmate-led religious services.  See

23  Anderson v. Angelone, 123 F.3d at 1198-99.  Restrictions on the manner in which inmates are permitted

24  to congregate unsupervised would seem on their face to entail determinations ill-suited to judicial

25  management.  See Thornburgh, 490 U.S. at 407-08.

26          The Court finds Defendants have carried their burden to present "significant, probative

27  evidence" in the form of Warden Hedgpeth's Declaration in support of their contention the restrictions

28  on his religious practices Davis complains of were justified by safety and security concerns, creating a

genuine issue of material fact for trial. Celotex, 477 U.S. at 324. Despite Davis' allegation Defendants'

security rational "is pretextual" (Dkt No. 38, 33:15-16), they have produced evidence from which a

reasonable fact-finder could conclude the curtailing of the religious practices Davis complains of was

in response to legitimate institutional safety and security needs. Disputed issues of material fact

accordingly preclude summary adjudication of Davis' First Amendment free exercise cause of action as

a matter of law, and the Motion is **DENIED** as to this claim.

## 2.      RLUIPA Violation Cause Of Action

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc to

2000cc-5 (2000) (the "RLUIPA") provides a statutory basis for "protect[ing] prisoners and other

institutionalized people from government infringement on their practice of religion," in addition to their

First Amendment free exercise protections. Mayweathers v. Newland, 314 F.3d 1062, 1065 (9th Cir.

2002); see Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). Section 3 of the RLUIPA provides:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined in an institution . . . unless the
> government demonstrates that imposition of the burden on that person –
> (1) is in furtherance of a compelling governmental interest; and (2) is the
> least restrictive means of furthering that compelling governmental
> interest.

42 U.S.C. § 2000cc-1(a);

Under traditional First Amendment jurisprudence, the prisoner's free exercise claims are analyzed

under the deferential "rational basis" standard of Turner, 482 U.S. 78. In contrast, "RLUIPA requires

the government to meet the much stricter burden of showing that the burden it imposes on religious

exercise is in furtherance of a compelling governmental interest; and is the least restrictive means of

furthering that compelling governmental interest."[5]  Greene v. Solano County Jail, 513 F.3d 982, 986

---

[5]  Congress enacted the RLUIPA, effective September 22, 2000, in response to the Supreme Court's
partial invalidation of the Religious Freedom Restoration Act ("RFRA") in City of Boerne v. Flores, 521 U.S.
507 (1997), which declared the RFRA unconstitutional as applied to the states. See Wyatt v. Terhune, 315 F.3d
1108, 1115 (9th Cir. 2003). Both Acts were adopted in response to the Supreme Court's decision in Employment
Div., Dept. of Human Resources v. Smith, 494 U.S. 872 (1990). Among other things, the Smith rejected the strict
scrutiny standard of review formerly applied to free exercise claims and held that individuals cannot claim
exemptions from generally applicable laws simply because the laws conflict with their religious practices. Smith,
494 U.S. at 878-82, 890 ("neutral, generally applicable laws may be applied to religious practices even when not
supported by a compelling governmental interest"). The RLUIPA restored to review of free exercise claims
sought under the statute the "compelling interest/least restrictive means" standard previously articulated in
Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972).

(9th Cir. 2008), *citing* Cutter, 544 U.S. at 717 (internal quotations omitted); *see also* Mayweathers, 314 F.3d at 1069.  Thus, by codifying a "compelling governmental interest" prerequisite to the imposition of "a substantial burden on the religious exercise" of incarcerated persons, the RLUIPA extends to prisoners engaged in religious conduct federal statutory protections beyond the protections embodied in the First Amendment..

The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also* Cutter, 544 U.S. at 715.  The statute expressly instructs it "shall be construed in favor of broad protection of religious exercise." 42 U.S.C. § 2000cc-3(g).  "[T]he plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion," although the statute does not define with specificity what constitutes a "substantial burden" on religious exercise.[6]  42 U.S.C. § 2000cc-2(b). Accordingly, only if a plaintiff prisoner demonstrates a challenged CDC regulation imposed a substantial burden on his or her exercise of religion does the burden shift to the defendant to demonstrate that the regulation was designed to further a compelling governmental interest and was the least restrictive means of furthering that interest.

Defendants dispute Davis' characterization  the suspension of his ability to purchase and possess prayer oil in his cell imposed a "substantial burden" on his religious exercise, characterizing those restrictions as no "more than an inconvenience." (Dkt No. 41, Opp. 3:12-17, citing Bryant v. Gomez 46 F.3d 948, 949 (9th Cir. 1995) (applying the RFRA "compelling interest" test and requiring more than an inconvenience to establish a substantial burden); *but see* Shakur, 514 F.3d at 884-85 (rejecting the "objective centrality" test for religious beliefs followed in Bryant in favor of the "sincerity of belief" test).)  They emphasize DOM Supplement 101060 did not preclude Davis from praying.  They argue "there are no facts before this Court that establish any Plaintiff [*sic*] was precluded from continuing his prayers or that he was precluded in practicing his faith in any way," particularly as "DOM Supplement

---

[6]  *See* 146 Cong. Rec. S7774-01, July 27, 2000, Joint Statement of Sen. Hatch and Sen. Kennedy, S. 2869/H.R. 4862 ("The Act does not include a definition of the term 'substantial burden' because it is not the intent of this Act to create a new standard for the definition of 'substantial burden' on religious exercise").

E.D. California 1:08cv1197-JTM(JMA)

101060 on its face did not preclude inmates from using prayer oils." (Dkt No. 41, Opp. 3:15-21.) Davis does not dispute "[i]nmates could still use prayer oils in the chapel." (Id., 3:23.) However, he contends his faith requires him to use prayer oil whenever he prays. Accordingly, the Court finds whether the policy substantially burdened his exercise of religion presents a material issue of fact in dispute.

In addition, material issues of fact regarding the penological necessity for imposing DOM Supplement 101060 preclude summary judgment of Davis' RLUIPA claim. As traced above, Warden Hedgpeth declares the restrictions were imposed in response to institutional safety and security concerns. Although the Court makes no factual findings on the merits of claims and defenses in deciding summary judgment motions, Davis does not attempt to refute Warden Hedgpeth's sworn representations contraband had been smuggled into the prison in prayer oil vials distributed by the dismissed Imam to Muslim prisoners. Courts must accord deference to prison authorities in matters "within the province and expertise of corrections officers," and institutional safety and security are concerns "central to all other corrections goals." Pell, 417 U.S. at 827, 823.

Finally, with respect to the least restrictive means element of an RLUIPA claim, Defendants contend DOM Supplement 101060, as challenged here, was narrowly tailored to prayer oils purchased and possessed by inmates in their cells and known by authorities to have been previously used as a means of introducing contraband into the prison. (Hedgpeth Decl. ¶ 5.) Muslim prisoners still had access to donated prayer oils stored in the chapel and could use them there for prayer and during religious services. Davis offers no example of a less restrictive means to accomplish the stated objective of the regulatory restriction. The Court finds Defendants have raised triable issues of fact on essential elements of Davis' RLUIPA claim, preventing its summary adjudication in Davis' favor as a matter of law. Accordingly, summary adjudication of this claim is **DENIED**

### D.   Davis Fails To State A Claim For Retaliation, Equal Protection, Or An Eighth Amendment Violation

#### 1.   Retaliation Cause Of Action

Davis alleges: "Imam Bilal was disposed of and right after that, the Muslim community at Kern Valley State Prison was retaliated against due to Imam Bilal promptly filing of [sic] his civil suit." (Dkt No. 32, FAC 11:6-9.)

1  The retaliation was started by the Imam Bilal Mustafa litigation against
2  Kern Valley State Prison.  Plaintiff happen[s] to be of that class of
   Muslims who was retaliated against.

3  (Dkt No. 32, FAC 12:26-13:1.)

4  "A prisoner suing prison officials under [Section] 1983 for retaliation must allege that **he was**

5  **retaliated against for exercising *his* constitutional rights** and that the retaliatory action does not

6  advance legitimate penological goals, such as preserving institutional order and discipline." <u>Barnett v.</u>

7  <u>Centoni</u>, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam) (emphasis added) (prisoner challenging

8  reclassification on grounds of retaliation for his having *himself* previously filed civil rights actions

9  against prison officials regarding his medical treatment); *see also* <u>Rhodes v. Robinson</u>, 408 F.3d 559,

10  567-68 (9th Cir. 2005) (alleging retaliation against *prisoner plaintiff who had filed* prison grievances);

11  <u>Pratt v. Rowland</u>, 65 F.3d 802, 806 (9th Cir. 1995) (alleging double-celling and transfer to a different

12  prison of a prisoner in retaliation for *his* having high-profile media contact).  Such claims must be

13  evaluated in light of the deference accorded to prison officials whose conduct can be justified by "neutral

14  institutional objectives."  *See* <u>Pratt</u>, 65 F.3d at 807-08..  The prisoner must submit evidence to establish

15  a link between his or her own exercise of constitutional rights and the allegedly retaliatory action.

16  *Compare* <u>Pratt</u>, 65 F.3d at 807 (finding insufficient evidence) *with* <u>Vance v. Barrett</u>, 345 F.3d 1083,

17  1093 (9th Cir. 2003) (finding sufficient evidence prison officials retaliated against prisoners for their

18  refusal to waive their procedural due process property right to money in prison trust accounts).

19  "Within the prison context, a viable claim of First Amendment retaliation entails five basic

20  elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of

21  (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

22  Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

23  <u>Rhodes</u>, 408 F.3d at 567-68 (footnote omitted); *see* <u>Barnett</u>, 31 F.3d at 816 (same); *see also* <u>Pratt</u>, 65

24  F.3d at 806, 807 (alleging harm is enough to ground a First Amendment retaliation claim).  The Court

25  notes that Defendants articulated the essential elements of a retaliation cause of action in their Motion

26  To Dismiss Davis' original Complaint, and exposed the deficiencies in Davis' initial statement of that

27  claim.  (Dkt No. 23-2, pp. 4-5.)  Despite that notice, Davis continues to rely for the basis of his

28  retaliation claim on the conduct of third-party Imam Mustafa in exercising his right to file a lawsuit

1   against KVSP after he was fired as the alleged cause for Defendants' purported retaliatory decision to

2   prohibit Muslim inmates from purchasing and possessing prayer oils in their cells.  (Dkt No. 32, FAC

3   p. 11.)  Defendants concede the right to petition the court is a constitutional right.  (Dkt No. 41, Opp.

4   6:18-19.)  However, Davis does not plead any of his own conduct triggered the purportedly retaliatory

5   measures.  He identifies no personal exercise of a constitutional right which allegedly motivated

6   Defendants to impinge his religious practices.  As argued by Defendants, on the facts Davis alleges, he

7   cannot "establish that any of the named Defendants retaliated against him for exercising a protected

8   right," foreclosing relief for an alleged First Amendment retaliation claim.  (Dkt No. 41, Opp. 6:20-21.)

9   Exercising its authority under 42 U.S.C. § 1997e(c) to *sua sponte* dismiss a ground for relief that fails

10  to state a claim upon which relief can be granted, the Court **DISMISSES** Davis' retaliation claim as a

11  matter of law and without further leave to amend.  *See* Barnett, 31 F.3d at 815-16.

### 2.      Equal Protection Cause Of Action

13          The Fourteenth Amendment Equal Protection Clause prohibits the states from denying any

14  person the equal protection of the laws, with the general objective that all persons similarly situated

15  should be treated alike.  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  To

16  prevail on an equal protection claim under 42 U.S.C. § 1983, a plaintiff must plead and prove "the

17  defendants acted with an intent or purpose to discriminate against the plaintiff based on membership in

18  a protected class."  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001), *quoting* Barren v.

19  Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998).  The "intent" component of the discrimination requires

20  a showing "the defendant acted at least in part *because of* the plaintiff's protected status."  Serrano v.

21  Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).

22          Prisoners are protected by the Equal Protection Clause from intentional discrimination on the

23  basis of their religion.  *See* Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), *citing* Cruz, 405 U.S.

24  at 321-22, *overruled in part by* Shakur, 514 F.3d at 884-85.  "The Constitution's equal protection

25  guarantee ensures that prison officials cannot discriminate against particular religions."  Freeman, 125

26  F.3d at 737.  Although prison officials need not provide identical facilities or personnel to different

27  faiths (Cruz, 405 U.S. at 322 n.2), they must make "good faith accommodation of the [prisoner's] rights

28  in light of practical considerations."  Allen, 827 F.2d at 569.  A facially neutral policy having a

disproportionate impact on an identifiable group does not necessarily mean it violates the Equal Protection Clause.  <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264-66 (1977).

Davis alleges Defendants violated his equal protection rights during the period while KVSP was without a Muslim chaplain, following the dismissal of Imam Mustafa, and did not permit Muslim prisoners to conduct their own unsupervised Islamic services.  Although he acknowledges prison regulations prohibit all inmate faiths from conducting their own unsupervised religious services, he nevertheless argues an inmate minister should have been allowed to take over the Muslim services.  He compares the Muslim prison population to a purportedly similarly situated inmate group he identifies as the Men's Advisory Committee ("MAC").  He represents the MAC is permitted to hold its meetings run by individuals they elect from among themselves.  (Dkt No. 38, MSJ 8:22-9:7; 19:6-10.)  "It is blatant discrimination to allow the election of a non-Muslim representative to sit on the MAC. (Men's Advisory Committee) and act on behalf of non-Muslims but to deny that same right and practice to the Muslims."  (<u>Id</u>. 3:26-4:2.; *see also* <u>id.</u> 27:8-28:1.)

Defendants argue Davis' Equal Protection claim is fatally flawed for several reasons, including lack of evidence to sustain the required elements of "similarly situated" groups treated disparately.  They also argue Davis has no evidence causally connecting "any of the Defendants"[7] to that policy or supporting his allegation of an intent to discriminate against Davis and the Muslim inmate community in enforcing the policy against inmate-run religious services.  (Dkt No. 41, Opp. 8:3-11.)  First, they rely on Davis' own description of the MAC members as not a religious group at all.  They argue that example, accordingly, cannot provide a factual basis for demonstrating the treatment of Muslim worshipers is invidiously dissimilar to the treatment received by other, similarly situated inmate groups.  For the period of time Muslims were without a Chaplain after Imam Mustafa's departure and were denied approval to conduct worship services by themselves, the policy may have impacted Muslims'

---

[7]    In Opposition to the MSJ, Defendants represent: "Defendants Billings, Castro, and Flores were simply part of the inmate grievance process which reviewed a group appeal that Plaintiff had joined. There are no facts to tie any of these Defendants to an actual violation of Plaintiff's civil rights." (Dkt No. 41, Opp. 9:1-3.) However, they offer no factual support for these representations in the form of Declarations or any other evidence, and those representations conflict with Davis' FAC allegations describing their offices and roles in the withdrawal of Muslim services after Imam Mustafa was terminated and denial of prayer oils in cells.

1   ability to participate in religious services differently from other religious groups whose chaplains were

2   not dismissed. However, Davis offers no evidence from which it could reasonably be inferred the intent

3   of the policy was to discriminate against him and the other Muslim inmates due to their membership in

4   a protected class.

5        DOM Supplement 101060.6.3 uniformly regulates "Use Of Inmate Ministers" without regard to

6   any particular religious faith, and Davis has identified no religious group in the prisoner population

7   treated differently from the Muslim inmates. The supplemental DOM policy on its face prohibits all

8   unsupervised inmate-conducted religious services, drawing no distinction between Muslims and

9   adherents to other faiths. Defendants merely adhered to the policy. Therefore, the Court finds Davis

10  has failed to support with any evidence his conclusory allegation Defendants targeted Muslims for

11  discriminatory treatment on the basis of their membership in a protected class. Lee, 250 F.3d at 686.

12  Accordingly, the Court **DISMISSES** Davis' Equal Protection claim as a matter of law for failure to state

13  a claim and without further leave to amend.

14                  **3**.     **Eighth Amendment Cause Of Action**

15       Davis names only Warden Hedgpeth in his Eighth Amendment cause of action. He alleges:

16  "The failure of Defendant A. Hedgpeth to intervene and reverse these violations that trampled upon the

17  rights to practice and establish one's religion is a deliberate indifference to the suffering of Plaintiff and

18  discriminatory behavior of these defendants coupled with the reprisals and retaliatory actions constitutes

19  an 8th, 14th, 1st Amendment violation and a disregard and violation of the R.L.U.I.P.A. Act." (Dkt No.

20  32, FAC 16:13-21.) He appears to base this claim on an alleged failure to prevent the implementation

21  by the other Defendants of the supplemental policy Warden Hedgpeth himself added to the DOM in

22  response to perceived institutional needs.

23       "It is undisputed that the treatment a prisoner receives in prison and the conditions under which

24  he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S.

25  25, 31 (1993). Prison officials "must ensure that inmates receive adequate food, clothing, shelter, and

26  medical care" and "must take reasonable measures to guarantee" their personal safety. Farmer v.

27  Brennan, 511 U.S. 825, 832-33 (1994). The Eighth Amendment proscribes the imposition of cruel and

28  unusual punishments "extending beyond physically barbarous punishments." See Estelle v. Gamble, 429

1   U.S. 97, 102 (1976); Hutto v. Finney, 437 U.S. 678, 685 (1978) (conditions in isolation cell); *see also*

2   Spain v. Procunier, 600 F.2d 189, 200 (9th Cir. 1979) (outdoor exercise deprivation and unwarranted

3   use of tear gas).  Nevertheless, conditions of confinement may, consistent with the Constitution, be

4   "restrictive and even harsh." *See* Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Morgan v. Morgensen,

5   465 F.3d 1041, 1045 (9th Cir. 2006) (same).

6        Plaintiffs can establish an Eighth Amendment constitutional violation only when "both the

7   objective and subjective components of a two-part test" are satisfied.  Hallett v. Morgan, 296 F.3d 732,

8   744 (9th Cir. 2002), *citing* Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  First, the deprivation alleged

9   must be, objectively, sufficiently serious, that is, implicates the "minimum civilized measure of life's

10   necessities."  Rhodes, 452 U.S. at 347.  The second requirement is subjective and follows from the

11   principle that only the unnecessary and wanton infliction of pain or a condition of confinement that

12   offends decency implicates the Eighth Amendment.  To satisfy the second element, a prison official must

13   have a "sufficiently culpable state of mind."  Farmer, 511 U.S. at 834 ("In prison-conditions cases that

14   state of mind is one of 'deliberate indifference' to inmate health or safety"); *see also* Wilson, 501 U.S.

15   at 302-03; Hope v. Pelzer, 536 U.S. 730, 737-38 (2002).

16        A liberal interpretation of a civil rights complaint does not extend to supplying " 'essential

17   elements of the claim that were not initially pled.' "  Bruns, 122 F.3d at 1257, *quoting* Ivey, 673 F.2d

18   at 268; *see also* Pena, 976 F.2d at 471.  Davis alleges no physical injury, no serious deprivation of

19   anything remotely satisfying the objective element of an Eighth Amendment claim (no wanton infliction

20   of pain, no threat to his health or safety, or any other indecent condition of confinement, singly or in

21   combination) associated with any failure to act on the part of Warden Hedgpeth.  Warden Hedgpeth

22   established an institutional policy restricting, as pertinent here, prisoners' purchase and possession of

23   prayer oil in their cells and inmate gatherings for religious services unless supervised by approved

24   persons defined in the policy.  Only if Davis had satisfied the objective prong of the Eighth Amendment

25   analysis would Warden Hedgpeth's state of mind become an issue.

26        The Court notes that Defendants articulated the essential elements of an Eighth Amendment

27   cause of action in their Motion To Dismiss Davis' original Complaint, and exposed the deficiencies in

28   Davis' statement of that claim in that pleading (Dkt No. 23-2, pp. 5-6), deficiencies he has not remedied

1  in his restatement of the claim in his FAC.  Exercising its authority under 42 U.S.C. § 1997e(c) to *sua*

2  *sponte* dismiss a ground for relief that fails to state a claim upon which relief can be granted, the Court

3  **DISMISSES** Davis' Eighth Amendment claim, as a matter of law and without further leave to amend.

4  **III.    CONCLUSION AND ORDER**

5          For all the foregoing reasons, **IT IS HEREBY ORDERED** Plaintiff's Motion For Summary

6  Judgment is **DENIED**.   For the reasons discussed above, **IT IS FURTHER ORDERED** Davis'

7  Retaliation, Equal Protection, and Eighth Amendment claims are **DISMISSED** for failure to state a

8  claim upon which relief can be granted and without leave to amend, in consideration of his having

9  already filed an Amended Complaint without correcting the deficiencies in his pleading of those claims

10  in the original complaint.

11          **IT IS SO ORDERED.**

12  DATED:  July 1, 2010

13  _____

14  Hon. Jeffrey T. Miller
    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28