1
2
3
4
5
6
7
8

9          **UNITED STATES DISTRICT COURT**

10         **EASTERN DISTRICT OF CALIFORNIA**

11         **FRESNO DIVISION**

12

13   **DORIAN DAVIS aka WALI AL-TAQUI,**          Civil No.      1:08-CV-1197-JTM (JMA)
     **CDC #k-78041,**
14
                                    **Plaintiff,**    **ORDER GRANTING DEFENDANTS'**
15                                                    **MOTION FOR SUMMARY**
                                                     **JUDGMENT**
16                   **v.**

17   **E.G. FLORES,** *et al.*,

18                                  **Defendants.**    **[Dkt No. 48]**

19

20          Plaintiff Dorian Davis ("Davis"), a state prisoner proceeding *pro se* and *in forma pauperis* with

21   a First Amended Complaint ("FAC") (Dkt No. 32) in this 42 U.S.C. § 1983 civil rights action, alleges

22   that officials at Kern Valley State Prison violated his federal constitutional and statutory rights associated

23   with implementation of a regulation that Defendant Warden A. Hedgpeth added to the Department

24   Operations Manual, effective from December 7, 2007 to July 8, 2008.  That regulation, as pertinent here,

25   prohibited prisoners' purchase and possession of prayer oils in their cells, a practice permitted before and

26   after the effective dates of the policy supplement.  By Order entered July 2, 2010, the court denied

27   Davis's Motion For Summary Judgment and dismissed as a matter of law all of his claims other than his

28   First Amendment cause of action and his claim under the Religious Land Use and Institutionalized

1  Persons Act of 2000, 42 U.S.C. §§ 2000cc - 2000cc-5 (the "RLUIPA"). (Dkt No. 46.)  Remaining

2  defendants Warden Hedgpeth and correctional officers E.G. Flores, J. Castro, and T. Billings (collectively

3  "Defendants") now move for summary judgment on the two remaining claims, pursuant to FED. R. CIV.

4  P. ("Rule") 56 ("Motion"). (Dkt No. 48.) The court provided Davis with a Klingele/Rand notice

5  informing him of the consequences should Defendants' Motion be granted and instructing him what he

6  must do to successfully oppose the Motion. (Dkt No. 49.) After a deadline extension (Dkt Nos. 51-51),

7  Davis timely filed an Opposition (Dkt Nos. 53-57), and Defendants filed a Reply (Dkt No. 58).  The court

8  granted Davis additional leave to augment his opposition, but he ultimately filed no additional briefing

9  to supplement his October 7, 2010 Opposition papers.[1]  After careful consideration of the evidence, the

10  parties' briefing, and controlling legal authority, for the reasons discussed below, the Motion is

11  **GRANTED**.

12  **I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

13         The facts of this case are familiar to the parties and were summarized in the July 2, 2010 Order

14  denying Davis's summary judgment motion and dismissing his Retaliation, Equal Protection, and Eighth

15  Amendment claims associated with the conduct challenged in the FAC. (*See* Dkt No. 46.) The court

16  repeats the facts and procedural history here only insofar as they are relevant to the remaining First

17  Amendment and RLUIPA claims and pertinent to the resolution of Defendants' Motion.

18         Davis, a Muslim of the Al-Islam faith, arrived at Kern Valley State Prison ("KVSP") in October

19  2005.  Between December 1, 2007 and July 8, 2008, pursuant to Supplement 101060 Warden Hedgpeth

20  added to the Department Operations Manual ("DOM"), Davis and other Muslim prisoners were not

21  permitted to purchase and possess prayer oils in their cells for use in religious practices prescribed by

22  their faith.  The pertinent portion of the challenged policy provides:

---

23       [1]  Davis initially moved on August 24, 2010 for a 30-day extension of time to file his Opposition, granted
by Order entered August 30, 2010. (Dkt Nos. 50-51.) On October 7, 2010, he requested an additional two-week
24  extension of time to file his Opposition. (Dkt No. 52.) However, on the same date, he also filed an extensive
Opposition to the Motion. (Dkt Nos. 53-57.) Defendants filed their Reply on October 14, 2010. (Dkt No. 58.)  On
25  November 19, 2010, the court entered an Order in response to the pending extension request giving Davis until
December 3, 2010 to supplement his Opposition. (Dkt No. 61.) On December 1, 2010, Davis moved again for a
26  short extension of time to file additional briefing. (Dkt No. 63.) The court granted him an extension, to December
14, 2010. (Dkt No. 64.) On December 6, 2010, the day the court entered its extension Order, Davis moved to
27  withdraw his extension request. Dkt No. 65). The court denied that motion because it had already granted him the
requested extension. (Dkt No. 66.) Davis ultimately filed no additional briefing after his original Opposition on
28  October 7, 2010. (Dkt Nos. 53-57.)

101060.10  SACRAMENTAL WINE AND RELIGIOUS ARTIFACTS . . . **Prayer Oils** must be non-flammable and non-alcoholic in factory plastic see-through sealed containers accompanied by a Material Safety Data Sheet (MSDS) indicating contents in oil.  Only four fragrances (Egyptian Musk, Medina Musk, Blue Nile, and Somali Rose)[] prayer oils may be donated to the institution. Prayer oils will only be used during religious services in the chapel.  Inmates will not be able to purchase or possess this item.

(Dkt No. 38, pp. 56, 60, 69, 74.)

Although Muslim prisoners continued to have access to prayer oils in the prison chapel, Davis contends his religious practice was substantially burdened by the deprivation of prayer oil accessible at all times in his cell. He sues Warden Hedgpeth for having imposed that burden through the DOM Supplement and sues the other defendants for having upheld and implemented the policy by denying an administrative appeal Davis filed to protest the prayer oil restrictions, a policy he contends violated both his First Amendment and RLUIPA rights. (FAC, Dkt No. 32, pp. 16-17.) He sues Defendants "in their official and individual capacity." (Id. at p.15.)  He seeks monetary damages to compensate "for the pain and suffering for their denial of religious practices" and for the "deprivations of Plaintiff['s] worship oil that prevented his religious practices," as well as punitive damages. (Id. at pp. 17-19.) He also seeks a declaratory judgment that Defendants Flores, Billings, and Castro denied him "the right to purchase and possess religious prayer oil without a penological interest conducive to a safety and security concern," and that Defendant Hedgpeth failed to stop or reverse their actions in enforcing his policy. In addition, Davis seeks injunctive relief ordering defendants Flores, Castro, and Billings "to release the oils and other artifacts of Plaintiff and other Muslims similar[ly] situated" which were confiscated while the ban was in effect. (Id. at p.17.) There is no dispute that the named Defendants, all correctional officers, were acting under color of state law in implementing or enforcing  the institutional policy formalized as DOM Supplement 101060. The parties dispute whether Defendants violated any federal right.

## II.      DISCUSSION

### A.      Legal Standards

#### 1.      Civil Rights Act, 42 U.S.C. § 1983

The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983 ") ""'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v.

1   <u>Connor</u>, 490 U.S. 386, 393-94 (1989) (citation omitted). Section 1983 liability "arises only upon a

2   showing of personal participation by the defendant," acting under color of state law, that deprived the

3   plaintiff of a constitutional or federal statutory right. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).

4   "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section

5   1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

6   which he is legally required to do that causes the deprivation of which complaint is made." <u>Johnson v.</u>

7   <u>Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978). There is no *respondeat superior* liability under Section 1983.

8   <u>Monell v. Dept. of Soc. Servs</u>, 436 U.S. 658 (1978) (the supervisor of someone who violates a plaintiff's

9   constitutional rights is not made liable for the violation by virtue of that role).

10      Federal courts hold a *pro se* litigant's pleadings to "less stringent standards than formal pleadings

11   drafted by lawyers." <u>Eldridge v. Block</u>, 832 F.2d 1132, 1137 (9th Cir. 1987) (punctuation and citation

12   omitted); *see* <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007) (*per curiam*) (a document filed *pro se* "is

13   to be liberally construed"; a plaintiff need only give the defendant fair notice of the claim and the grounds

14   on which it rests) (citation omitted). "However, a liberal interpretation of a civil rights complaint may not

15   supply essential elements of the claim that were not initially pled." <u>Ivey v. Board of Regents</u>, 673 F.2d

16   266, 268 (9th Cir. 1982). In addition, the advantage of liberal construction does not entitle *pro se*

17   pleadings to receive the benefit of every conceivable doubt, but only to reasonable factual inferences in

18   the plaintiff's favor. <u>McKinney v. De Bord</u>, 507 F.2d 501, 504 (9th Cir. 1974).

19              **2.    <u>Prison Litigation Reform Act</u>**

20      The Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e ("PLRA"), modified the processing

21   of *pro se* prisoners' civil rights complaints. The court may now at any time dismiss an action or portions

22   of it, *sua sponte* or on a party's motion, if the "action is frivolous, malicious, fails to state a claim upon

23   which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief."

24   42 U.S.C. § 1983e(c); *see also* 28 U.S.C. § 1915. The PLRA also restricts the availability and extent of

25   remedies prisoners may seek in civil rights actions. For example, the recovery of compensatory damages

26   for mental or emotional injury suffered while in custody requires "a prior showing of physical injury" that

27   is more than *de minimus*. 42 U.S.C. § 1997e(e) ("No federal civil action may be brought by a prisoner

28   . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury.");

1   *see* Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002) (the physical injury "need not be significant" but

2   it "must be more than de minimus"); *see also* Jackson v. Carey, 353 F.3d 750, 758 (9th Cir. 2003).

3   However, no such showing applies when, as here, the allegations of constitutional violations are not

4   premised on mental or emotional injury, such as claims arising under the First Amendment, "regardless

5   of the form of relief sought." Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998). The PLRA also

6   affects the prospective injunctive relief that may be awarded, but retained substantially unchanged "the

7   threshold findings and standards required to justify an injunction." Gomez v. Vernon, 255 F.3d 1118,

8   1129 (9th Cir. 2001); *see also* 18 U.S.C. § 3626(a)(1)(A) (1997).

9                   **3.      Summary Judgment Standard Of Review**

10          Any claiming or defending party "may move, with or without supporting affidavits, for summary

11   judgment on all or part of the claim." Rule 56(a), (b). Summary judgment is properly entered "if the

12   pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

13   issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c);

14   *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc. 477 U.S. 242,

15   256 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial

16   to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306

17   (9th Cir. 1982). The substantive law defining the elements of the claim controls the materiality of facts.

18   *See* Anderson, 477 U.S. at 248. A complete failure of proof concerning an essential element of the non-

19   moving party's case necessarily renders all other facts immaterial. *See* Celotex, 477 U.S. at 323.

20          The moving party bears the initial "burden of showing the absence of a genuine issue as to any

21   material fact, and for these purposes the material it lodged must be viewed in the light most favorable to

22   the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The movant is not required

23   to produce evidence negating the non-movant's claims. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885,

24   888-89 (1990) ("[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute

25   as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact

26   before the lengthy process of litigation continues."). If the moving party fails to discharge this initial

27   burden, summary judgment must be denied, "even if no opposing evidentiary matter is presented."

28   Adickes, 398 U.S. at 159-60.

If the movant carries its burden, the burden then shifts to the non-moving party to establish facts beyond the pleadings showing that a genuine issue of disputed material fact makes summary judgment improper. Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157. The opposing party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324, quoting FED. R. CIV. P. 56(e). That party may not rest on conclusory allegations or mere assertions (see Taylor, 880 F.2d at 1045), and the "mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to create a genuine issue for trial. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001) (citation omitted); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (there is no genuine issue for trial if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion); see also Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) ("To avoid summary judgment, [the plaintiff] was required to present significant probative evidence tending to support her allegations.") (punctuation and citations omitted). The opposing party's evidence must create specific, material factual issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 249-50, 256 (citation omitted); see Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988) ("Sweeping conclusory allegations will not suffice to prevent summary judgment.").

The court accepts the version of facts most favorable to the non-moving party in deciding a Rule 56 motion. Anderson, 477 U.S. at 255. The court does not make credibility determinations, weigh conflicting evidence, or draw its own inferences, as those are functions reserved for the trier of fact. Id. at 249, 255, 249 (the district court's only role on summary judgment is to determine whether there is a genuine issue for trial). "[W]here the [material] facts specifically averred by [the opposing] party contradict facts specifically averred by the movant, the motion must be denied." Lujan, 497 U.S. at 888; Anderson, 477 U.S. at 252 (considering the evidence from both sides, "[i]f reasonable minds could differ" and there is "evidence on which the jury could reasonably find for the [non-moving] party," summary judgment for the moving party is improper). Conversely, summary judgment must be entered for the moving party "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250-251; Celotex, 477 U.S. at 325; see San Diego Police Officers' Ass'n v. San

1   Diego City Employees' Retirement Sys., 568 F.3d 725, 733 (9th Cir. 2009) (a "moving party is entitled

2   to judgment as a matter of law" when, viewing the evidence "in the light most favorable to the non-

3   moving party, there are no genuine issues of material fact").

4          **B.    Defendants' Motion And Davis's Opposition**

5          Defendants contend: "(1) Defendants did not engage in any conduct that violated Plaintiff's civil

6   rights; (2) Defendants Billings, Castro, and Flores[] had no connection to Plaintiff's claims aside from

7   responding to Plaintiff's administrative grievance; (3) Plaintiff may not recover monetary damages under

8   RLUIPA; and (4) Defendants are entitled to qualified immunity." (Dkt No. 48-1, 1:25-2:2.) They support

9   their Statement Of Undisputed Facts (Dkt No. 48-2) with their Declarations, summarizing:

10               KVSP is a level-four institution, which houses CDCR's most
        violent and dangerous inmates. (Fact 3, 4.) In 2007, KVSP officials found
11       that a chaplain had been smuggling contraband into the prison.
        (Defendant's Statement of Undisputed Facts (Fact) 1.) This Chaplain was
12       distributing contraband to the inmates through multiple channels,
        including through containers of prayer oil. (Fact 2.) Hedgpeth created and
13       implemented DOM Supplement 101060 on December 7, 2007, to address
        the security concerns raised by the discovery of the chaplain's smuggling.
14       (Fact 5.)

15               Under DOM Supplement 101060, inmates were no longer allowed
        to purchase or possess prayer oils in their cells. (Fact 6.) Prayer oils could
16       be donated to the institution and used in the prison chapel. (Fact 7.) DOM
        Supplement 101060 stayed in effect until KVSP officials were confident
17       that no more contraband was being smuggled into the prison through
        prayer oil containers. (Fact 9.) On July 8, 2008, Hedgpeth issued an
18       addendum to DOM Supplement 101060 that again allowed inmates to
        purchase and possess prayer oils in their cells. (Fact 10, 11.)
19
                Plaintiff, a practicing Muslim, submitted a group grievance on
20       January 6, 2008, (KVSP-08- 0061) claiming that KVSP inmates were
        being unfairly prevented from purchasing prayer oils and storing them in
21       their cells. (Fact 12.) Defendant Flores, an acting Associate Warden,
        along with Lieutenant Whitehead denied Plaintiff's grievance at the first
22       level of review citing to DOM Supplement 101060. (Fact 13.) Defendant
        Billings, a correctional counselor, investigated Plaintiff's claims at the
23       second level of review. (Fact 14.) Defendant Castro, the acting Chief
        Deputy Warden, denied Plaintiff's grievance at the second level of review,
24       also citing to DOM Supplement 101060. (Fact 15.)

25   (Dkt No. 48-1, 2:4-25.)

26          Davis's points and authorities in support of his Opposition is comprised of 32 pages of argument

27

28

                                    - 7 -                      E.D. California 1:08cv1197-JTM(JMA)

accompanied by 58 pages of exhibits.[2] (Dkt No. 56.) Those exhibits include: multiple pages of Chapel services schedules; copies of other Islamic inmates' appeals within the institution on various grounds, including complaints of unequal treatment; Davis's grievance appeal on grounds like those alleged in this lawsuit (Id. at pp. 66-70); copies of DOM regulations related to religious practices (Id. at pp. 71-85); a Declaration from inmate Sy Lee Castle (Id. at p.86); and documents associated with the 2009 appeal of another inmate complaining about restrictions on religious services (Id. at pp. 88-90). In addition, Davis filed a 43-page "Briefing Facts" document (Dkt No. 57) and two separately docketed Declarations totaling an additional 24 pages in which he authenticates documents he received from inmate Castle (Dkt Nos. 54-55).

Davis's Opposition filings reargue his entire case and all the theories he advanced in his FAC, without regard for the considerable narrowing of issues through the court's July 2, 2010 Order denying him summary judgment and dismissing all but two of his original claims. (Dkt No. 46.) He offers conclusory narratives purporting to support such characterizations as "the defendants are lying, deceiving, and misleading the court." (See, e.g., Dkt No. 56, pp. 6:26-7:10.) Davis expends considerable energy defending Imam Bilal Mustafa—the cleric whom Defendants contend was smuggling contraband into the prison, the discovery of which they claim led Warden Hedgpeth to implement DOM Supplement 101060—and asserting his dismissal was purportedly on "false charges" devised for the purpose of "get[ting] rid of [him] due to he complained too much verbally 'bout the Administration violating the Religious Rights of their subjects." (Dkt No. 56, p.13; see also Id. at 18:13-20.)

Davis argues Defendants have not substantiated their representation that an investigation of "smuggling contraband" was actually undertaken. (Dkt No. 56, 18:8-13.) He challenges their affidavits as "self-serving" and lacking "adequate specific factual information based on personal knowledge" and, therefore, "insufficient to defeat a motion for summary judgment, let alone to sustain one." (Dkt No. 56, pp. 14-15.) The court **OVERRULES** those evidentiary objections as without merit. Courts may consider sworn affidavits "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant is competent to testify on the matters stated" in deciding summary

---

[2] Docket No. 56 has been designated a "Motion" due to Davis's caption language on his Opposition document. The Clerk of Court is instructed to remove the inaccurate "Motion" code associated with that docket entry.

1   judgment motions. Such declarations suffice as supporting evidence for a party's factual representations.

2   FED. R. CIV. P. 56(d)(1). Warden Hedgpeth personally devised, implemented, then lifted the challenged

3   policy restricting the possession of prayer oil in prisoners' cells. He states under oath his reasons for

4   doing so, and justifies the duration of the restrictions as coinciding with the duration of the contraband

5   investigation, contrary to Davis's contention that "the defendants have not backed up their Affidavits with

6   any evidence." (Id. at p. 15.)

7      Davis addresses Defendants' Statement of Undisputed Facts by stating: "From 1 to 19 Plaintiff

8   disputes it all." (Dkt No. 53, p. 2.) He complains that "Defendants haven't said anything in the[ir]

9   'Statement of Undisputed Facts' that was not said in their Affidavits (or Declarations)" purportedly

10  "backed up by no evidence." (Id.) Davis again misconstrues the evidentiary nature of declarations made

11  on personal knowledge for purposes of summary judgment review. The court finds Defendants'

12  Declarations sufficed to shift the burden to Davis to set out specific facts supported by competent

13  evidence "showing a genuine issue for trial" to avoid summary judgment in their favor. Rule 56(e)(2).

14  Davis's 43-page narrative document, captioned "Briefing Facts That Defendants Have Not Asked For

15  Summary Judgment On The Denial Of Religious Services," does not conform to the format prescribed

16  by Local Rule.[3] (Dkt No. 57.) In addition, his arguments are non-responsive insofar as they fail to address

17  considerations relevant to the only two claims remaining in this matter. He reargues at length claims the

18  court dismissed in the course of denying his summary judgment motion. (See Dkt No. 46.)

19     In the first of his two separately docketed Declarations in support of his Opposition, Davis

20  authenticates a Declaration from fellow inmate Castle and a February 8, 2008 document attached to the

21  Castle Declaration purportedly "showing that there was no investigation going on regarding Islamic

22  Religious Package," and purportedly contradicting a "talk [Davis] had with Captain Tyson dated March

23  19th, 2008." (Dkt No. 55, p.1.) He provides no affidavit or any other authoritative evidence from any

24  source with likely personal knowledge of the prison's internal administrative functions to support his

---

25      [3] Eastern District Local Rule 56-260 requires that a separate statement of undisputed facts accompany a
26  summary judgment motion. The opposing party is expected to respond with a fact-by-fact agreement, agreement
    in part and/or a showing by reference to evidence where the court might find a disputed material fact. The court
27  rules are designed to allow the adjudicator to look in one place to see if a party is disputing a fact set forth by the
    moving party as undisputed. See, e.g., Pogue v. Woodford, 2009 WL 2777768 at *5 (E.D. Cal. Aug. 26, 2009).
28  At this stage in the action, where several of the claims have been eliminated by prior court Order, the parties are
    expected to focus on the narrowed scope of relevant facts and evidence.

1  proposition that the prison conducted no investigation of contraband concealed in prayer oil containers.

2  Furthermore, Davis embeds another of his own Declarations in his Opposition which memorializes

3  Captain Tyson's confirmation to him in March 2008 that an investigation was ongoing at that time,

4  providing support for, rather than undermining, Defendants' representations.[4] (Dkt No. 56, p. 70.)

5      The second of Davis's separately docketed Declarations purports to authenticate a document

6  which he represents as "Defendant Hedgpeth's Responses To Plaintiff Sy Lee Castle['s] First Set Of

7  Interrogatories" from September 2010, apparently associated with a separate lawsuit filed by inmate

8  Castle in November 2008. (Dkt No. 54.) The court declines to consider materials from other lawsuits in

9  deciding Defendants' Motion in this case. Moreover, Davis uses it to accuse Warden Hedgpeth of

10 "conceal[ing] the date that Chaplain Bilal was fired" and the "date when this alleged determination of

11 smuggling was discovered." (Dkt No. 54, pp. 1-2.) Based on that premise, he makes the following

12 conclusory representations: "Again the ISU was never investigating Islamic Religious Packages because

13 it was never a case of smuggling but a conspiracy to get rid of Chaplain Bilal Mustafa because he

14 complained to A. Hedgpeth about prohibiting purchasing and possessing of religious oil." (Id. at p. 2.)

15 Such unsupported speculation does not inform the resolution of this Motion.

16      In reliance on their Declarations, Defendants' Reply asserts that Davis fails to controvert their

17 evidence demonstrating that: the implementation of DOM Supplement 101060 was in response to an

18 institutional need to thwart the serious security threat posed by the smuggling of contraband into the

19 prison; inmates retained access to prayer oils in the prison chapel during the approximately six-month

20 period the regulation remained in effect; the burden imposed by the policy was the least restrictive means

21 of addressing the problem of contraband introduced into prisoner's cells in prayer oil containers; and the

22 restriction ended as soon as the threat was eliminated. (Dkt No. 58.) Defendants further contend that

23 Davis's claim for monetary damages against them in their individual or official capacities under the

24 RLUIPA must be dismissed as a matter of law; that he fails to refute their contention that they are entitled

25 to qualified immunity; and that he fails to refute their showing that his allegations describing the

---

26  [4] That Declaration states: "While a resident at Kern Valley State Prison on 'A' Facility, on the 19th of
27  March 2008 while at the law library window, plaintiff seen the then 'A' Facility captain Tyson and questioned him
    regarding the religious oil that arrived there (Kern Valley State Prison). Plaintiff was told that ISU had Muslims
    oil and *once they're done with the inspection and investigation* then they would decide what their [*sic*] gonna do
28  with it." (Dkt No. 56, p. 70 (emphasis added).)

involvement of defendants Billings, Castro, and Flores in the alleged constitutional and statutory violations cannot support liability under Section 1983 because they had no involvement in creating the regulation they were bound to enforce such that their role in deciding the grievance was essentially supervisory in nature. (Id.)

**C.      Davis Substantiates No Triable Issue Of Material Fact To Save His First Amendment Free Exercise Cause Of Action**

**1.      First Amendment Free Exercise Standard Of Review**

"The First Amendment, applicable to the States by reason of the Fourteenth Amendment . . . prohibits government from making a law 'prohibiting the free exercise (of religion).'" Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam) (citation omitted). "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545 (1979); see McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) ("The right to exercise religious practices and beliefs does not terminate at the prison door."); see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). However, "[t]he free exercise right . . . is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." McElyea, 833 F.2d at 197 (citations omitted); see also O'Lone, 482 U.S. at 348; Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008). "[T]he institutional consideration of internal security within the correctional facilities" is "central to all other corrections goals." Pell, 417 U.S. at 832. Institutional regulations shown to have a logical connection to the asserted correctional objective are not actionable as an arbitrary or irrational deprivation of rights. Ashker v. Cal. Dep't of Corr., 350 F.3d 917, 922 (9th Cir. 2003).

Courts accord prison officials considerable deference when analyzing the constitutional validity of prison regulations.[5] See Beard v. Banks, 548 U.S. 521, 528-30 (2006) (in disputed matters of professional judgment, "our inferences must accord deference to the views of prison authorities"), citing

---

[5] The Turner Court rejected the application of "strict scrutiny" to First Amendment claims. "Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Turner, 482 U.S. at 89.

1  Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Turner v. Safley, 482 U.S. 78, 84-85 (1987); Prison

2  Legal News v. Cook, 238 F.3d 1145, 1149 (9th Cir. 2001). In evaluating a Free Exercise claim, courts

3  must give "appropriate deference to prison officials," O'Lone, 482 U.S. at 349, because "the judiciary

4  is 'ill-equipped' to deal with the difficult and delicate problems of prison management." Thornburgh v.

5  Abbot, 490 U.S. 401, 407-08 (1989). Courts analyze the competing interests of the institution and the

6  prisoner by applying a "reasonableness" test to First Amendment challenges. Turner, 482 U.S. at 89 (a

7  prison regulation that impinges on First Amendment rights "is valid if it is reasonably related to legitimate

8  penological interests").

9         The four Turner factors courts apply to assess reasonableness are: (1) whether there is a valid,

10  rational connection between the regulation and a legitimate and neutral government interest; (2) whether

11  there are alternative means of exercising the constitutional right; (3) the impact accommodation of the

12  right will have on prison staff and other prisoners; and (4) whether the regulation is an exaggerated

13  response to prison concerns, in light of readily available alternatives. Id. at 89-91; see Beard, 548 U.S.

14  at 528 (applying the Turner analysis to access to publications and photographs); Overton, 539 U.S. at

15  132 (applied to freedom of association); Lewis v. Casey, 518 U.S. 343, 361 (1996) (applied to access

16  to courts); Morrison v. Hall, 261 F.3d 896, 901 (9th Cir. 2001) (applied to prison mail regulation);

17  Mauro v. Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc) (applied to sexually explicit material).

18              **2.    Summary Adjudication For Defendants**

19         In order to prevail on his First Amendment Free Exercise violation claim, Davis must prove that

20  the suspension of inmates' purchase and possession of prayer oil in prison cells pursuant to the DOM

21  Supplement infringed a sincerely held religious tenet without penological justification. See Shakur, 514

22  F.3d at 884-85. The court accepts for purposes of deciding the Motion the unrefuted representations that

23  Davis believes as a tenet of his Muslim faith he should use prayer oil whenever he prays, supported by

24  the evidence of his sworn Declaration, and that the deprivation of prayer oil in his cell during the period

25  in which the challenged DOM Supplement was in effect infringed that sincerely held religious belief.

26         Concerning the penological justification component of the claim, Defendant Hedgpeth explains:

27  "All prisons within the CDCR are run by a Department Operations Manual (DOM) established by CDCR

28  headquarters and implemented uniformly at each prison." (Dkt No 48-6, ¶ 2.) A "[w]arden has discretion

1   to establish a Supplement to the DOM based on an individual prison's needs." (Id. ¶ 3.) He declares he

2   established DOM Supplement 101060 on December 7, 2007 motivated by institutional safety and security

3   concerns.[6] He declares his objective was to restrict prisoners' purchase and possession of prayer oils in

4   their cells in response to the discovery of contraband smuggled into the institution in prayer oil containers

5   distributed to prisoners by a Muslim Imam, Bilal Mustafa. (Id. ¶ 4.) Inmates were still permitted "to use

6   prayer oil during religious services in the prison chapel" during the period the cell possession restriction

7   was in place. (Id.) He describes his reasoning and the scope of the restriction:

8           5.      DOM Supplement 101060 was created in response to serious
            safety and security concerns that had arisen at KVSP. Prior to establishing
9           DOM Supplement 101060, KVSP officials determined that a chaplain was
            smuggling contraband into the prison and distributing the contraband to
10          the inmates. One way the contraband was distributed, was through the
            distribution of containers of prayer oils. KVSP is a security level four
11          prison. Level four prisons house the most dangerous and violent inmates
            incarcerated within CDCR. The possibility of unknown contraband hidden
12          by level four inmates under the guise of being prayer oil caused me grave
            concern.

13
            6.      Therefore, I was forced to create DOM Supplement 101060 in
14          order to remove all potential contraband from the prison and ensure that
            inmates were not in possession of contraband. Under DOM Supplement
15          101060, inmates were still allowed to use prayer oils in the prison chapel,
            which was open to inmate use during the day and during religious
16          services. Because inmates were still able to use prayer oils and the
            institution was able to address contraband concerns, this was determined
17          to be the least restrictive means of ensuring the safety and security of the
            institution.
18
    (Dkt No. 48-6, ¶¶ 5-6.)
19
            Warden Hedgpeth further declares that soon after implementing DOM Supplement 101060,
20
    "KVSP staff began the process of investigating and removing the contraband that the chaplain had
21
    distributed to the inmates." (Dkt No. 48-6, ¶ 7.) "[A]fter resolving all lingering safety and security issues
22
    with inmates possessing prayer oils, I issued an addendum to DOM Supplement 101060" on July 8, 2008,
23
    "allowing inmates to purchase sixteen ounces of prayer oils through approved vendors so long as the
24
    prayer oil was in a clear plastic container, non-flammable and non-alcoholic," while continuing to forbid
25
    chaplains from buying, donating, or distributing prayer oils to inmates. (Id. ¶ 8.)
26

27          ───────────────
            [6] The DOM Supplement 101060 "Religious Programs" text dated December 7, 2007 is provided in its
28  entirety as Docket No. 38, pages 56-74. The portion related to "Sacramental Wine And Religious Artifacts,"
    Section 101060.10, is provided at pages 65-72. The Prayer Oils restriction text appears at page 69.

1    The court finds the Hedgpeth Declaration sufficed to shift the burden to Davis to raise a triable

2    issue of material fact on the adequacy of the penological justification and the reasonableness of the means

3    used to curtail inmates' unrestricted possession of prayer oils while the institution investigated and

4    confiscated contraband associated with that source. *See* Celotex, 477 U.S. at 324; Adickes, 398 U.S. at

5    157. To avoid summary judgment, Davis needed to produce evidence from which a reasonable factfinder

6    could conclude the restriction was not implemented to advance a legitimate penological interest, or the

7    policy was more restrictive than necessary to achieve its goal.[7] Ashker, 350 F.3d at 922; Turner, 482 U.S.

8    at 89.

9    The first Turner factor instructs the court to examine whether there is a valid, rational connection

10   between the regulation and the legitimate interest used to justify the regulation. Turner, 482 U.S. at 89;

11   *see* Ashker, 350 F.3d at 922; Morrison, 261 F.3d at 901; Cook, 238 F.3d at 1151. Legitimate penological

12   interests include the preservation of order and discipline, the maintenance of institutional security, and

13   the rehabilitation of the prisoners. *See* Thornburgh, 490 U.S. 401 (regulation concerning entry of

14   materials into a prison to forestall risk of disorder); *see also* Mauro, 188 F.3d at 1059 (protecting

15   guards). When the question relates to the connection between the regulation of religious exercise and

16   legitimate penological interests, evidence concerning anticipated problems is sufficient to meet the

17   standard, even though no actual problems have arisen from the prisoner's conduct restricted by the

18   regulation. *See* Standing Deer v. Carlson, 831 F.2d 1525, 1528 (9th Cir. 1987). Reviewing with the

19   required deference the constitutional validity of the regulation in consideration of the Hedgpeth

20   Declaration, the court finds Davis has raised no triable issue of material fact from which a reasonable fact-

21   finder could conclude the DOM Supplement to halt the introduction of contraband into inmates' cells and

22   to confiscate prayer oil containers already distributed lacked a valid, rational connection to the neutral

23   _____

24   [7] Davis acknowledges that "[r]ecently, the Islamic practice of putting on oil for salat (prayer) and other
     rituals ha[s] been restored to the Muslim[s] . . . by the permission from these same defendants to purchase and

25   possess oil" beginning in July 2008. (FAC, Dkt No. 32, p.14; *see July 8, 2008 revision text at* Dkt No. 38, pp. 145,
     132.) However, he would have the court characterize the restoration of that privilege as Defendants' admission they

26   wrongly imposed and enforced the DOM Supplement restricting prayer oil possession, creating "an implication that
     it was a blatant violation of the right of Plaintiff to practice his religion." (Id.) He summarily alleges "this act of

27   returning the right to freely practice one's religious acts such as putting on oil to perform salat and other rituals
     is to try to clean up or right the wrong because there was never a security or safety reason cited for the denial to

28   purchase and possess religious prayer oil." (Id. p.15.) Such idiosyncratic interpretations are insufficient to create
     a genuine issue of material fact for avoidance of summary judgment.

1   and legitimate concern for institutional safety and security

2          Davis argues Defendants "have not demonstrated that they considered anything" in the nature of

3   "alternatives to resolving defendants security concerns," an omission he contends shows they "ignored"

4   the "4th prong of the 'Turner Test' and second prong of the 'RLUIPA Test.'" (Dkt No. 56, p.21.) By

5   way of example in support of his argument, he describes an incident from September 2007, about three

6   months before the DOM Supplement was implemented, in which prison administrators allegedly failed

7   to deliver a package to him within the time frame prescribed by prison regulations for the distribution of

8   packages to inmates. He characterizes that delay as demonstrating that Defendants actually withheld his

9   religious oil (assuming that was what the package contained) "well before the new Supplemental D.O.M.

10  came out" and summarily argues that that incident "proves that they had no care at all whether or not

11  they were violating Plaintiff['s] constitutional rights." (Id. at pp. 21-22.) Sweepingly conclusory

12  allegations of that nature are insufficient to prevent summary judgment. Leer, 844 F.2d at 634. Davis

13  submits numerous pages of similar anecdotal descriptions and argument from which he urges the court

14  to infer that the prayer oil restriction was unconstitutional. His submissions do not meet his burden under

15  the summary judgment standard of review.

16         The deficiencies of Davis's Opposition are further illustrated by his speculation imputing wholly

17  unsubstantiated motivations to prison officials. For example, he challenges the reasons for terminating

18  Imam Bilal Mustafa and implementing the Supplemental DOM as pretextual:

19                 See Affidavit [of inmate Lee Castle] attached as "Ex. P" [Dkt No.
                   56, p. 86]. The Imam Mohammad, the succeeding Muslim chaplain after
20                 chaplain Bilal at Kern Valley State Prison told Inmate Castle #C-82790
                   that Bilal was never dismissed for any contraband smuggling but he was
21                 harassed and discriminated against because he defended and made
                   complaints regarding Religious by way of going straight to the Captains
22                 or Warden and his Associates which they interpreted as harassment.
                   Although inference may be left for trial jurors, but what would his suit be
23                 based on? What he should be allowed to smuggled contraband Again,
                   these defendants had an evil intentions and a hatred that Imam Bilal
24                 Mustafa aggrieved the rights of the Religious inmates. So the defendants
                   concocted false charges to rid Kern Valley State Prison of this 'seemingly'
25                 problem. In consequen[ce], such lies was used to deprive Plaintiff and
                   others similar of their rights to practice their religion.
26
27  (Dkt No. 56, pp. 22-23; see also Id. at p.31 ("What [is] unique about Plaintiff['s] case is that

28  [Defendants'] whole reason behind the prohibition of oil use is lies and concocted and unless they come

                                                    - 15 -

1   up with proof of their allegation that contraband was being smuggled in their allegation should be deemed

2   as such.").)

3        The Castle Declaration, offered in support of Davis's argument that the contraband smuggling

4   rationale for implementing the DOM Supplement was pretextual, contains hearsay representations

5   purporting to repeat what a successor Muslim chaplain, Imam Muhammad, told Castle in September

6   2009. (Dkt No. 56, p. 86.) Imam Muhammad purportedly told Castle that Bilal Mustafa was suspended

7   then eventually terminated "because he had a conversation with A. Hedgpeth (Warden) at Kern Valley

8   State Prison concerning Islamic Community religious rights being violated for banning Muslims from

9   purchasing and possessing prayer oils," and also purportedly told Castle that "there were no penological

10  interests" for Warden Hedgpeth to have terminated Imam Balil Mustafa. (Id. at p.86.) Davis could

11  conceivably cure the inadmissible evidentiary *form* of those representations at the time of trial, and the

12  court deciding a summary judgment motion focuses on the admissibility of evidence's content rather than

13  its form. Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003), *citing* Block v. City of Los Angeles,

14  253 F.3d 410, 418-19 (9th Cir.2001) ("To survive summary judgment, a party does not necessarily have

15  to produce evidence in a form that would be admissible at trial, as long as the party satisfies the

16  requirements of Federal Rules of Civil Procedure 56."); *see also* Fed. Deposit Ins. Corp. v. N.H. Ins. Co.,

17  953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that

18  would be admissible at trial in order to avoid summary judgment.") (internal punctuation and citation

19  omitted). However, it does not appear to the court Davis can cure the content deficiency, because even

20  if the quoted Imam were to provide his own Declaration, it would be objectively unreasonable to ascribe

21  to a contractual clergyman personal knowledge of the inner workings of the prison administration in its

22  investigatory or other penological operations, particularly as Imam Muhammad appears not to have been

23  a percipient witness to any of the events from 2007 and 2008 giving rise to Davis's FAC.

24       In denying Davis's own Motion For Summary Judgment (Dkt No. 46), the court found that

25  Defendants carried their shifted burden to present "significant, probative evidence," in the form of

26  Warden Hedgpeth's Declaration, in support of their contention that the restrictions on Davis's religious

27  practices were justified by safety and security concerns, creating a genuine issue of material fact for trial.

28  Celotex, 477 U.S. at 324. With their positions and burdens reversed here, where Defendants are the

1  moving party and Davis the opposing party, viewing all the evidence in the light most favorable to Davis

2  as the non-moving party, the court finds Davis has not carried his shifted burden to raise a triable issue

3  of material fact on essential components of his First Amendment claim. FED. R. CIV. P. 56(e)(2).

4      Judging by his Opposition submissions, Davis has no evidence to refute the penological

5  justification for or the reasonableness of the challenged regulation. *See* Turner, 482 U.S. at 89-91. The

6  court finds that, as a matter of law, confiscating and preventing the continued introduction of contraband

7  into the prison to preserve the discipline, safety, and security of the institution are indisputably legitimate

8  penological objectives. Pell, 417 U.S. at 823, 827. Similarly, Warden Hedgpeth selected a means by

9  which to attain that objective—a policy supplement to temporarily disrupt the contraband distribution

10 mechanism (*i.e.*, prayer oil containers possessed by inmates in their cells)—that was not an exaggerated

11 response to the smuggling problem in the absence of any readily available alternative. His Declaration

12 substantiates the fact that the restriction did not extend to inmates' use of prayer oils in the prison chapel,

13 "which was open to inmate use during the day and during religious services," and characterizes the scope

14 and duration of the restriction as "the least restrictive means of ensuring the safety and security of the

15 institution" because "inmates were still able to use prayer oils and the institution was able to address

16 contraband concerns." (Dkt No. 48-6, ¶ 6.)

17     Davis's proposed less restrictive means to achieve the articulated safety and security goal is not

18 persuasive. His argument that the authorities could have "returned the confiscated prayer oils to the

19 inmate owners" and simply restricted the introduction of new prayer oil deliveries to cells fails to account

20 for the fact that prayer oil containers already in the prison were the very source from which the initial

21 evidence of contraband concealment and distribution was obtained. The DOM Supplement temporarily

22 restricting possession of prayer oils in cells thus narrowly targeted only the very objects and means

23 discovered to have created the specific safety and security threat.

24     The only conduct Davis alleges against the other correctional officers he sues was to deny him

25 the administrative relief from enforcement of Warden Hedgpeth's policy he pursued through the prison

26 grievance system. There is no dispute that the warden was empowered to supplement the DOM in

27 response to perceived institutional needs. Davis offers no authority for the proposition that correctional

28 officers are individually empowered to disregard formally implemented institutional regulations or may

1  be found liable for constitutional violations on grounds they did not do so in processing an inmate's

2  appeal.

3          In summary, according the required deference to prison administrators, the court finds Davis has

4  produced no evidence from which a reasonable fact-finder could find in his favor on a First Amendment

5  Free Exercise violation theory under these circumstances. Davis is unable to show that no "valid, rational

6  connection" exists between the policy relegating the use of prayer oils to the chapel and the "legitimate

7  and neutral government interest" of preventing further possession and dissemination of contraband in

8  prisoners' cells, or that the regulatory response was "exaggerated" in comparison to the threat. Turner,

9  482 U.S. 89-91. Defendants are accordingly entitled to judgment as a matter of law on Davis's First

10  Amendment cause of action, and the Motion is **GRANTED** as to this claim.

11      **D.**    **Davis Substantiates No Triable Issue Of Material Fact To Save His RLUIPA Cause Of Action**

12          **1.**    **RLUIPA Standard Of Review**

13          The RLUIPA extends to prisoners federal statutory protections against "government infringement

14  on their practice of religion" beyond the protections embodied in the First Amendment. Mayweathers v.

15  Newland, 314 F.3d 1062, 1065, 1069 (9th Cir. 2002). Section 3 of the RLUIPA provides:

16          No government shall impose a substantial burden on the religious exercise

17          of a person residing in or confined in an institution . . . unless the government demonstrates that imposition of the burden on that person –

18          (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

19  42 U.S.C. § 2000cc-1(a).

20          The RLUIPA expands the reach of protection by defining "religious exercise" to include "any

21  exercise of religion, whether or not compelled by, or central to, a system of religious belief." Cutter v.

22  Wilkinson, 544 U.S. 709, 715 (2005). The RLUIPA also inserts the burdens of the strict scrutiny

23  standard. Id. at 714-15, 709, 725. In contrast to traditional First Amendment jurisprudence analyzing a

24  prisoner's free exercise claims under the "rational basis" test of Turner, 482 U.S. 78, 89 (the "legitimate

25  penological interest" and "reasonableness" standards), the "RLUIPA requires the government to meet

26  the much stricter burden of showing that the burden it imposes on religious exercise is in furtherance of

27  a compelling governmental interest[,] and is the least restrictive means of furthering that compelling

28

1    governmental interest." Greene v. Solano County Jail, 513 F.3d 982, 986 (9th Cir. 2008), *citing* Cutter,

2    544 U.S. at 717 (internal quotations omitted); *see also* Mayweathers, 314 F.3d at 1069. However, the

3    strict scrutiny standard does not eliminate the deference accorded to prison administrators charged with

4    running state institutions. Cutter, 544 U.S. at 723.

5          To prevail on a RLUIPA claim, the prisoner must identify a governmental practice which

6    "substantially burdens" the exercise of his or her religion. Shakur, 514 F.3d at 889; *see* 42 U.S.C.

7    §§ 2000cc-1(a); 2000cc-2(b) ("[T]he plaintiff shall bear the burden of persuasion on whether the law

8    (including a regulation) or government practice that is challenged by the claim substantially burdens the

9    plaintiff's exercise of religion."). Once the prisoner presents a *prima facie* claim, the burden then shifts

10   to the defendant to prove that the prison policy or action both furthered a compelling government interest

11   and employed the least restrictive means for doing so. 42 U.S.C. §§ 2000cc-1(a)(1), (2); *see* Shakur, 514

12   F.3d at 889; *see also* Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir. 2005).

13                    **2.    Summary Adjudication For Defendants**

14         Defendants argue again, as they did in their Opposition to Davis's summary judgment motion,

15   that the DOM Supplement "simply presented an inconvenience to inmates like Plaintiff and not a

16   substantial burden as required for a valid RLUIPA claim." (Dkt No. 48-1, 5:1-3.) They argue no evidence

17   shows that the policy "precluded Plaintiff from praying or placed any burden, much less a substantial one,

18   on his ability to practice his faith." (Id. at 4:24-27, *citing* Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir.

19   1995) (a substantial burden "must be more than an inconvenience").) They emphasize that inmates were

20   not entirely precluded from using prayer oils, but were only prohibited from purchasing and possessing

21   prayer oils in their cells. (Id. at 4:27-5:1.)

22         However, the RLUIPA expressly instructs it "shall be construed in favor of broad protection of

23   religious exercise." 42 U.S.C. § 2000cc-3(g). Davis contends his religion requires him to use prayer oils

24   whenever he prays. One's exercise of religion through prayer is not necessarily limited to formal services

25   or relegated to a religious setting such as a chapel. The court continues to assume on that basis, for

26   purposes of deciding the summary judgment motions in this case, the restrictions of time and place on

27   Davis's access to prayer oil during the effective period of DOM Supplement 101060 substantially

28   burdened his exercise of religion, rather than posing a "mere inconvenience" as Defendants would have

1   it. (*See* Dkt No. 46). The court therefore concludes Davis has presented a *prima facie* claim that the

2   DOM Supplement "substantially burdened" his exercise of religion (*see* 42 U.S.C. § 2000cc-5(7)(A)),

3   shifting "the burden of persuasion" to the government on the elements of compelling need for the

4   restriction and a narrow tailoring of the burden imposed by the regulation (42 U.S.C. § 2000cc-2(b).

5        The court finds that Warden Hedgpeth's Declaration attesting to the factual basis for his

6   implementation of DOM Supplement 101060 and his rationale for the scope of the restriction satisfied

7   the required showing and shifted the burden to Davis to produce probative evidence to create a triable

8   issue of fact on those elements of his RLUIPA claim. The court further finds that Davis fails to offer any

9   evidence from which a rational trier of fact could conclude that no compelling governmental interest

10  justified the restrictions on his possession of prayer oil in his cell. Davis again misconstrues the

11  evidentiary nature of sworn Declarations for purposes of summary judgment. He relies on his

12  characterization of Defendants' representations as "lies" unsupported by documentary evidence that an

13  investigation was actually conducted, purportedly "because it never was a case of smuggling but a

14  conspiracy to get rid of chaplain Bilal Mustafa because he complained about prohibiting purchasing and

15  possessing of religious oil as the new Muslim chaplain Muhammad stated to the 'B' Facility Muslim

16  community." (Dkt No. 54, p.2.; *see also* Dkt No. 56, 18:13-20 ("The reason why the defendants have

17  not presented a document is because their claim of contraband is bogus and it was a concoction to rid

18  themselves of Bilal Mustafa, but in so doing they 'substantially burden' Plaintiff and other Muslims in the

19  practice of their religion.").)  The court rejected above the evidentiary proffer of inmate Castle's

20  Declaration purporting to repeat what Imam Muhammad told him on those issues. "Prison security is a

21  compelling governmental interest." Greene, 513 F.3d at 988, *citing* Cutter, 544 U.S. at 725, n.13. The

22  court finds that, as a matter of law, halting the introduction of contraband into prisoners' cells satisfies

23  the first prong of the RLUIPA test.

24       Concerning the RLUIPA's least-restrictive-means element, Warden Hedgpeth defends the policy

25  as narrowly tailored to target the discovered means through which the contraband was smuggled into the

26  prison, *i.e.*, in prayer oil containers. He expresses his conscious regard for preserving the maximum

27  access to prayer oils for the Muslim inmates' religious exercises consistent with the institutional need to

28  stop the dissemination of contraband into prisoners' cells and to investigate and confiscate the contraband

smuggled in the prayer oil containers. The DOM Supplement did not deprive Muslim inmates of all access to prayer oils. Despite the temporary burden on their free exercise, they retained access to prayer oil in the chapel. Notwithstanding Davis's speculation to the contrary, the Hedgpeth Declaration provides sufficient unrefuted evidence for purposes of deciding this Motion that Imam Mustafa was fired for cause because "KVSP officials determined [he] was smuggling contraband into the prison and distributing the contraband to the inmates." (Dkt No. 48-6, ¶¶ 5-6.) Courts must accord deference to prison authorities in matters "within the province and expertise of corrections officers," and institutional safety and security are concerns "central to all other corrections goals." Pell, 417 U.S. at 827, 823. As discussed above, Davis proposes no credible less restrictive alternative to address the discovery of smuggled contraband in prayer oil containers, and his proffered evidence falls short of creating a genuine factual dispute for trial. Finally, Davis's allegations against defendants Billings, Castro, and Flores support a finding that they merely adhered to the official policy then in place to deny Davis's administrative grievance challenging implementation of DOM Supplement 101060. The court finds Davis has not carried his burden to raise a triable issue of material fact in connection with his RLUIPA claim against any of the Defendants. Accordingly, they are entitled to judgment as a matter of law, and the court **GRANTS** the Motion on that claim.

The dismissal disposition of Davis's two remaining federal claims on the foregoing grounds makes it unnecessary for the court to reach the other Motion grounds, namely: Defendants' qualified immunity defense; the existence or absence of any substantive federal constitutional right to support a Section 1983 action against defendants Billings, Castro, and Flores, who contend their sole involvement was as participants in the administrative inmate grievance process; whether the RLUIPA authorizes money damages against defendants sued in their individual capacities (Dkt No. 48-1, 5:18-6:12); and whether the RLUIPA authorizes money damages against defendants sued in their official capacities (Id. at 6:13-7:6).[8]

## III.    CONCLUSION AND ORDER

For all the foregoing reasons, Defendants' Motion For Summary Judgment is hereby **GRANTED**,

---

[8] The court notes that the Ninth Circuit has held that the RLUIPA did not waive Eleventh Amendment immunity, barring suits for damages against state officials in their official capacities as impermissible suits against the State of California. See Holley v. CDC, 599 F.3d 1108 (9th Cir. 2010).

1  disposing of all remaining claims and parties. Judgment shall be entered accordingly, terminating this case

2  in its entirety.

3      **IT IS SO ORDERED.**

4  DATED:  January 14, 2011

5

6      Hon. Jeffrey T. Miller
        United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.D. California 1:08cv1197-JTM(JMA)